MAY 13 2024 PM 2:47
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | : | No. 24MJ    (SDV) |
| OF THE UNITED STATES OF AMERICA | : | 439 |
| FOR SEARCH WARRANTS AND ARREST | : | |
| WARRANTS | : | **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF COMPLAINTS AND APPLICATION FOR SEARCH WARRANTS

### I.    INTRODUCTION

I, Andrew Hoffman, a Special Agent of the Drug Enforcement Administration, Bridgeport Resident Office, being duly sworn, depose, and state the following:

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses, including but not limited to controlled substances offenses and money laundering offenses.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 1998. Upon completion of the 17-week DEA Basic Agent Academy in Quantico, Virginia, I was assigned to the DEA New York Division Office in New York City. In 2008, I was selected for a foreign assignment with the DEA Caribbean Division where I was stationed on the island of Curacao. In 2013, upon completion of the foreign assignment, I was assigned to my current assignment as part of the Bridgeport High Intensity Drug Trafficking Area Task Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Bridgeport Police Department, Norwalk Police Department, Stamford Police Department, Stratford Police Department, Danbury Police Department and

1

Milford Police Department. Prior to joining the DEA, I was a Probation and Parole Officer for the State of Florida for approximately five years.

3.     During the course of my career, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking, firearms trafficking, violent criminal activity, racketeering and money laundering. My participation in these investigations has included coordinating controlled purchases of narcotics utilizing confidential informants and cooperating witnesses; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; and testifying in Grand Jury and District Court proceedings. I have led investigations into organized criminal enterprises to include violent street gangs and complex narcotics trafficking organizations. I have participated in numerous Title III wiretap investigations, and on numerous occasions I have served as the affiant on successful applications seeking court-authorization to intercept wire and electronic communications under Title 18, United States Code, Sections §§ 2510, et seq.

4.     I am one of the case agents directing an investigation into a drug trafficking organization ("DTO") operating within the city of Stamford, Connecticut, and elsewhere, whose members and associates are participating in narcotics trafficking activity (including the trafficking of heroin, fentanyl, cocaine and cocaine base) in violation of Title 21, United States Code, Sections 841 and 846 (conspiracy to distribute and to possess with intent to distribute narcotics); Title 21 United States Code, Section 841 (possession with intent to distribute narcotics); Title 21, United States Code, Section 843(b) (use of a communication facility to facilitate a narcotics trafficking offense), and 18 United States Code, Section 1956 (money laundering). I have participated fully in this investigation, and as a result of my participation

2

and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit.

5.      I am specifically investigating Rodney CANADA a.k.a. "Supreme," Terrell WILLS a.k.a. "Black Fred," Ramion BAKER a.k.a. "Ray Ray," Willi BAZELAIS, Alvin NEWTON a.k.a. "Butters", Christopher ADAMS, Gerald COLEY, Benjamin DOZIER, Danny TURKVAN, a.k.a. "Smooth," Julio SANTOS aka "Domi" aka "Abdul", Lamont COREY a.k.a. "DJ," Gavin HAMMETT, Michael HAMMET, and Jimmy ARCE, a.k.a. "Boe,", a.k.a. "Slim," a.k.a. "Jimbo," and others for violations of Title 21, United States Code, Sections 841 and 846 (conspiracy to distribute and to possess with intent to distribute narcotics); Title 21 United States Code, Section 841 (possession with intent to distribute narcotics); Title 21, United States Code, Section 843(b) (use of a communication facility to facilitate a narcotics trafficking offense), and 18 United States Code, Section 1956 (money laundering).

6.      The statements contained in this affidavit are based on: (1) my participation in the investigation; (2) information provided to me by Special Agents and Task Force Officers of the Drug Enforcement Administration (DEA); (3) information provided to me by members of the Stamford and Bridgeport Police Departments; (4) toll record and pen register analysis; (5) physical surveillance; (6) Title III interceptions; (7) electronic surveillance via fixed video surveillance; (8) global positioning system information for Target Telephones and Target Vehicles; and (9) my training and experience. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and part and, where applicable, are based on draft transcripts.

7.      **This affidavit is submitted in support of criminal complaints and arrest warrants for Rodney CANADA a.k.a. "Supreme," Terrell WILLS a.k.a. "Black Fred,"**

Ramion BAKER a.k.a. "Ray Ray," Willi BAZELAIS, Christopher ADAMS, Gerald

COLEY, Benjamin DOZIER, Danny TURKVAN, a.k.a. "Smooth," and Jimmy ARCE,

a.k.a. "Boe" a.k.a. "Slim," a.k.a. "Jimbo," charging them with conspiracy to possess with

the intent to distribute and distribution of, as well as possession with intent to distribute,

and distribution of, controlled substances (specifically, heroin, fentanyl and cocaine base

or crack and cocaine) from approximately February of 2024 to the present in violation of

21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846 (the "Target Offenses") and for Jimmy

ARCE, a.k.a. "Boe" a.k.a. "Slim," a.k.a. "Jimbo," charging him with conspiracy to

possess with the intent to distribute and distribution of, as well as possession with intent

to distribute, and distribution of, controlled substances (specifically, heroin and fentanyl

in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), (b)(1)(B) and 846) from

approximately January of 2023 to the present as more specifically detailed by defendant

below.

      8.     This affidavit is also submitted in support of search warrants. I believe

there is probable cause to search the following locations and vehicles for evidence and

contraband as detailed in Attachment B to each application for search warrant and the

warrant itself:

          i.     There is probable cause to believe, and I do believe, that Rodney

CANADA and Alvin NEWTON and their associates store bulk quantities

of controlled substances, as well as drug proceeds, drug ledgers,

packaging materials, cutting agents, drug proceeds, drug ledgers, and

other evidence, fruits, and instrumentalities of drug trafficking at a

residence they occupied at **22 Frederick Street, Stamford, Connecticut ("Subject Premises One").**

ii.   There is probable cause to believe, and I do believe, that Rodney CANADA stores drug proceeds, drug ledgers, and other evidence, fruits, and instrumentalities of drug trafficking at CANADA's mother's residence at **352 Glenbrook Road, Apartment 30, Stamford, Connecticut ("Subject Premises Two").**

iii.  There is probable cause to believe, and I do believe, that Rodney CANADA, Terrell WILLS and their associates store bulk quantities of controlled substances, narcotic packaging materials, cutting agents, drug proceeds, drug ledgers, and other evidence, fruits, and instrumentalities of drug trafficking at Terrell WILL's residence at **216 West Avenue, Darien, Connecticut ("Subject Premises Three").**

iv.   There is probable cause to believe, and I do believe, that Rodney CANADA, Julio SANTOS aka "Domi" aka "Abdul", and their associates store bulk quantities of controlled substances, packaging materials, cutting agents, drug proceeds, drug ledgers, and other evidence, fruits, and instrumentalities of drug trafficking at SANTOS's residence at **511 Shippan Avenue, Apartment 4F, Stamford, Connecticut ("Subject Premises Four").**

v.    There is probable cause to believe, and I do believe that Ramion BAKER stores bulk quantities of controlled substances, drug proceeds, drug ledgers, and other evidence fruits, and instrumentalities of drug

trafficking at BAKER's residence at **98 Hoyt Street, Apartment 5E, Stamford, Connecticut ("Subject Premises Five")**

vi.   There is probable cause to believe, and I do believe that Ramion BAKER stores bulk quantities of controlled substances, drug proceeds, drug ledgers, and other evidence fruits, and instrumentalities of drug trafficking at a stash apartment used by BAKER at **40 Clinton Avenue, Apartment 301, Stamford, Connecticut ("Subject Premises Six")**

vii.   There is probable cause to believe, and I do believe that Gavin HAMMETT and Michael HAMMETT stores bulk quantities of controlled substances, drug proceeds, drug ledgers, and other evidence fruits, and instrumentalities of drug trafficking at a residence used by Michael HAMMETT at **2612 North Avenue., Unit A1, Bridgeport, Connecticut ("Subject Premises Seven")**

viii.   There is probable cause to believe and I do believe that Rodney CANADA transported controlled substances, drug proceeds, and other evidence, fruits, and instrumentalities of drug trafficking in a **2004 red BMW 325XI bearing Connecticut registration number BM33566 and vehicle identification number WBAEU33444PM59780 registered to Ecnera BROOKS, 225 Ludlow Street, Stamford, Connecticut ("Subject Vehicle One")**.

ix.   There is probable cause to believe and I do believe that Rodney CANADA transported drug proceeds, and other evidence, fruits, and instrumentalities of drug trafficking in an unregistered **2015 2-door**

**Mercedes Benz S Class bearing VIN WDDXJ8FB5FA006906**

**("Subject Vehicle Two").**

9.     Because this affidavit is being submitted for the limited purpose of securing arrest and search warrants, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth facts which I believe are necessary to establish the existence of probable cause to support the issuance of the arrest and search warrants requested herein.

## II.   CRIMINAL COMPLAINTS AND ARREST WARRANTS

10.     In particular, I make this affidavit in support of criminal complaints and arrest warrants for the following individuals for the Target Offenses as more specifically detailed below.

### A.   Rodney CANADA a.k.a. "Supreme" (DOB: 1977)

11.     Rodney CANADA is an approximately 46-year-old male. CANADA resides at 22 Frederick Street, Stamford, Connecticut. Additional residents at 22 Frederick Street include CANADA's girlfriend Aminour SHOHAN, Alvin NEWTON, Jason NIELSEN, Richard NIELSEN and Giaconda NIELSEN. Based on my knowledge of the case, as discussed in the probable cause section below, I believe that Rodney CANADA is the leader of a drug trafficking organization operating throughout the state of Connecticut and elsewhere (referred to herein as the "CANADA DTO").

12.     During the course of the electronic wire intercepts, electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that CANADA is the head of the CANADA DTO and utilizes the CANADA Telephones to distribute bulk quantities of controlled substances and to collect drug proceeds.  CANADA

utilizes the CANADA Telephones to communicate with his co-conspirators including Terrell WILLS a.k.a. "Black Fred," Willi BAZELAIS, Alvin NEWTON a.k.a. "Butters," Christopher ADAMS, Gerald COLEY a.k.a. "G-Rock", Benjamin DOZIER, Julio SANTOS aka "Domi" aka "Abdul", Lamont COREY a.k.a. "DJ and others, some of whom have not yet been identified. CANADA has the following criminal history which includes two prior drug convictions in the District of Connecticut: (a) January 4, 1995 conviction in Stamford for sale of narcotics for which he received 2 years' jail; (b) January 31, 1997 conviction in Stamford for assault 3 for which he received one year jail; (c) May 9, 2001 conviction in the District of Connecticut for possession with intent to sell cocaine base for which he received 140 months' prison followed by 5 years' supervised release; (d) May 30, 2001 conviction in Stamford for assault on public safety personnel for which he received 7 years' prison; (e) March 19, 2012 conviction in Bridgeport for operating under suspension for which he received 90 days jail suspended and 12 months' probation; (f) April 29, 2015 conviction in the District of Connecticut for possession with intent to sell cocaine for which he received 70 months' prison followed by 48 months supervised release; and (g)November 28, 2023 arrest in Stamford for threatening and breach of peace which are pending. CANADA is not currently on supervised release.

**B.  Terrell WILLS a.k.a. "Black Fred" (DOB: 1973)**

13.    Terrell WILLS is an approximately 50-year-old male. WILLS resides at 216 West Avenue, Darien, Connecticut. During the course of the electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that WILLS utilizes telephone number (203) 554-5825 to communicate with CANADA for the purposes of conducting drug related business on behalf of the CANADA DTO including, but

not limited to the distribute of controlled substances. WILLS has the following criminal history in the District of Connecticut: (a) March 18, 2014 conviction in the District of Connecticut for possession with intent to distribute cocaine base for which he received 48 months' imprisonment and 48 months' supervised release. WILLS has the following criminal history in the State of Connecticut:  (b) March 3, 2010 conviction for possession with intent to distribute narcotics for which he received 3 years' jail concurrent with other cases;  (c) December 1, 2004 conviction for sale of a hallucinogenic or narcotic substance for which he received a $500.00 fine and a December 1, 2004 conviction for Assault 1 for which he received 1 year jail concurrent with other cases;  (d) May 14, 2001 conviction for possession of narcotics for which he received 18 months jail consecutive with other cases;  (e) March 25, 1999 conviction for sale of a narcotic or hallucinogenic substance for which he received 30 months Jail; (f) December 20, 1996 conviction for Sale of a Narcotic or Hallucinogenic substance for which he received 30 months jail concurrent with other cases;  (g)  October 6, 1995 conviction for sale of a narcotic or hallucinogenic substance for which he received 18 months jail concurrent with other cases; and (h) February 22, 1995 conviction for Assault 3 for which he received 1 year jail. WILLS is not currently on federal supervised release.

**C.  Ramion BAKER a.k.a. "Ray Ray" (DOB: 1979)**

14.    Ramion BAKER is an approximately 43-year-old black male who was born in Connecticut.  BAKER's last known address is 98 Hoyt Street, Apartment 5E, Stamford, CT. During the course of the electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that BAKER utilizes telephone number (203) 667-8287 and (203) 561-7196 to communicate with CANADA for the purposes of conducting drug related business on behalf of the CANADA DTO including, but not limited to the

distribute of controlled substances. As described in more detail below, law enforcement has also conducted controlled buys into BAKER. BAKER has a criminal history that includes convictions in the State of Connecticut and District of Connecticut. BAKER has the following convictions in the District of Connecticut: (a) May 28, 2010 conviction for possession with intent to sell cocaine base for which he received 110 Months Imprisonment and an additional 72 Months of Supervised Release and; (b) March 27, 2019 conviction for a supervised release violation for which he received 33 Months Imprisonment. BAKER has the following criminal history in the State of Connecticut: (a) March 1, 2007 conviction for assault 1 for which he received 8 years jail, 1 year suspended, and 5 years' Probation; (b) January 13, 2005 conviction for weapon in a motor vehicle for which he received 60 days jail concurrent with other cases; (c) November 2, 1999 conviction for assault 3 for which he received 11 months jail concurrent with other cases; (d) August 8, 1997 conviction for sale of a controlled substance for which he received 18 months jail concurrent with other cases. BAKER currently has multiple open cases in the State of Connecticut related to the following arrests: May 25, 2022 arrest for robbery 3rd degree and larceny 2nd degree; a February 23, 2022 arrest for robbery 2nd degree; and a December 28, 2021 arrest for robbery 2nd degree and larceny 3rd degree. BAKER is not currently on federal supervised release.

**D.  Willi BAZELAIS (DOB: 1993)**

15.     Willi BAZELAIS is an approximately 30-year old male. BAZELAIS resides at a residence at 1 Daly Street, Stamford, Connecticut. During the course of the electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that BAZELAIS utilizes telephone number (475) 755-2127 to communicate with CANADA for the purposes of conducting drug related business on behalf of

the CANADA DTO including, but not limited to, the purchase of controlled substances from the CANADA DTO. BAZELAIS has the following criminal history: (a) August 31, 2018 conviction in Stamford for possession with intent to sell for which BAZELAIS was sentenced to 5 years' jail suspended and 5 years' probation; (b) August 27, 2018 conviction in Norwalk for possession of controlled substance for which he was fined $250; and (c) January 25, 2021 conviction in Stamford for possession with intent to sell and sale of controlled substance for which BAZELAIS was fined $1,500.

### E.  Christopher ADAMS (DOB: 1966)

16.     Christopher ADAMS is an approximately 57-year old male. ADAMS' current residence is unknown. During the course of the electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that ADAMS utilizes telephone number (203) 829-6582 and (203) 564-3749 to communicate with CANADA for the purposes of conducting drug related business on behalf of the CANADA DTO including, but not limited to, the purchase and distribution of bulk quantities of controlled substances. The interception of Target Telephone 3 led to the "wall off" seizure of approximately 80 grams of cocaine from ADAMS on March 8, 2024. ADAMS has the following criminal history: (a) June 16, 1994 conviction in Manhattan for criminal possession of a controlled substance for which ADAMS was sentenced to 3 years' probation; (b) August 30, 1995 conviction in Stamford for sale of narcotics for which ADAMS was sentenced to 3 years' jail suspended and 3 years' probation; (c) September 1, 2006 conviction in Milford, CT for possession of drug paraphernalia for which ADAMS was fined $250; (d) August 31, 2023 arrest in Norwalk for sale of narcotics in two counts and possession of a controlled substance which is pending; (e)

March 8, 2024 arrest in Norwalk for sale of cocaine and possession of a controlled substance which is pending.

**F.  Gerald COLEY (DOB: 1970)**

17.     Gerald COLEY is an approximately 54-year-old male. COLEY is believed to reside at 129 Black Rock Avenue, Unknown Apartment Number, Bridgeport, Connecticut. During the course of the electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that COLEY utilizes telephone number (203) 243-6934 to communicate with CANADA for the purposes of conducting drug related business on behalf of the CANADA DTO including, but not limited to, the brokering of the purchase of controlled substances and distribution of bulk quantities of controlled substances. COLEY has the following criminal history: (a) January 5, 1988 conviction in Stamford for possession of narcotics for which COLEY was fined $2,000; (b) October 27, 2014 conviction in Stamford for risk of injury for which COLEY was sentenced to four years' jail; and (c) October 17, 2002 conviction in the District of Connecticut for possession with intent to distribute 50 grams of more of cocaine base for which COLEY was sentenced to 151 months in prison followed by four years' supervised release. (d) August 20, 2014 conviction in the District of Connecticut for convicted felon in possession of a firearm and violation of the terms of federal supervised release for which COLEY was sentenced to 48 months prison followed by three years' supervised release. COLEY is not currently on federal supervised release.

**G.  Benjamin DOZIER a.k.a. "Prince" (DOB: 1984)**

18.     Benjamin DOZIER is an approximately 41-year-old male subject. DOZIER resides at a residence at 166 W Liberty Street, Apartment 2, Bridgeport, Connecticut. During the course of the electronic surveillance, in conjunction with physical surveillance, law

enforcement agents have developed evidence that DOZIER utilizes telephone number (475) 201-8597 to communicate with CANADA for the purposes of conducting drug related business on behalf of the CANADA DTO including, but not limited to, the sourcing of controlled substances. DOZIER has the following criminal history: (a) June 16, 2000 conviction in Norwalk for possession of narcotics for which DOZIER was sentenced to 5 years' jail with one year suspended and 5 years' probation; (b) August 8, 2017 conviction in Stamford for sale of narcotics for which DOZIER was sentenced to 7 years' jail with 3 years' suspended and 5 years' probation; (c) May 5, 2003 conviction in Stamford for criminal trespass for which DOZIER was fined $90; (d) August 5, 2004 conviction in Stamford for sale of illegal drugs 5 counts and criminal possession of a weapon for which DOZIER was sentenced to 15 years' jail with 8 years' suspended and 5 years' probation; (e) June 28, 2011 conviction in New Haven for assault 3 and breach of peace for which DOZIER was sentenced to 6 months jail suspended and one year probation; (f) October 15, 2010 conviction in New Haven for strangulation for which DOZIER was sentenced to one year jail suspended and 2 years' probation; (g) April 8, 2016 conviction in Milford for possession with intent to distribute for which DOZIER was sentenced to 42 months' jail; and (h) April 16, 2021 conviction in East Haven for possession with intent to distribute for which DOZIER was sentenced to 6 years' jail.

## H.  Danny TURKVAN a.k.a. "Smooth" (DOB: 1971)

19.     Danny TURKVAN is an approximately 52-year-old male subject. TURKVAN is believed to reside at 20 Stillwater Avenue, Unit 3, Stamford, Connecticut. During the course of the electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that TURKVAN utilizes telephone number (203) 559-7789 to communicate with CANADA for the purposes of conducting narcotics related business on

behalf of the CANADA DTO including, but not limited to, substances and distribution of bulk quantities of controlled substances. TURKVAN has the following criminal history: (a) May 29, 1998 conviction in Stamford for sale of narcotics for which TURKVAN was sentenced to 6 years' jail suspended and 3 years' probation; (b) July 23, 2002 conviction in Stamford for sale of illegal drugs for which TURKVAN was sentenced to 14 years' jail with 8 years' suspended and 5 years' probation; (c) April 15, 2009 conviction in Stamford for possession of narcotics for which TURKVAN was sentenced to 18 months jail; (d) June 6, 2011 conviction in Stamford for sale of narcotics for which TURKVAN was fined $2,000; (e) August 20, 2012 conviction in Stamford for possession with intent to sell for which TURKVAN was fined $5,000; (f) February 18, 2015 conviction in Stamford for sale of narcotics for which TURKVAN was sentenced to 4 year's jail; and (g) July 16, 2019 conviction in Stamford for sale of narcotics for which TURKVAN was sentenced to 3 years' jail and fined $15,000.

I. **Jimmy ARCE a.k.a. "Boe", a.k.a. "Slim,", a.k.a. "Jimbo," (DOB: 1983)**

20.     Jimmy ARCE is an approximately 39-year-old male. ARCE resides at 44 Herkimer Street, Bridgeport, Connecticut. During the course of the electronic surveillance, in conjunction with physical surveillance, law enforcement agents have developed evidence that ARCE utilizes telephone number (203) 545-2246, and that he is a criminal associate of CANADA and the cocaine, cocaine base and fentanyl source of supply for Stamford trafficker Omar PARRA (who is also facing pending charges on a separate federal criminal complaint as discussed further below, *see* 23mj230(SDV)). ARCE has the following criminal history: (a) March 30, 2004 conviction for  possession of narcotics and reckless endangerment 1st degree for which he received four years' jail, suspended sentence, four years' probation months; (b) January 16, 2004 conviction for criminal trespass 1st degree for which he received a $100 fine;

(c) December 20, 2005 conviction weapon in a motor vehicle, assault 2nd, violation of probation, breach of peace, and criminal trespass 3rd degree for which he received three years' jail, one year to serve, five years' probation; (d) October 24, 2007 conviction for sale of narcotics (3 counts) for which he received twelve years' jail, six years to serve, five years' probation; and (e) April 14, 2021 conviction for possession of narcotics with intent to sell, and weapons in a motor vehicle for which he received a $5,000 fine.

### III.   PERTINENT TITLE III ORDERS

21.   On February 5, 2024, United States District Court Judge Kari A. Dooley authorized the Title III wire interception for (203) 814-5532 ("Target Telephone 2") used by Rodney CANADA ("CANADA") for a period of 30 days. The interception of communications over Target Telephone 2 began on February 6, 2024 and terminatd on February 20, 2024. CANADA ceased using Target Telephone 2 on or about February 7, 2024.

22.   On February 20, 2024, United States District Court Judge Kari A. Dooley authorized the Title III wire interception for (203) 219-8218 ("Target Telephone 3") used by CANADA for a period of 30 days. The interception of communications Target Telephone 3 began on February 22, 2024 and terminated on March 22, 2024.

23.   On March 28, 2024, United States District Court Judge Kari A. Dooley re-authorized the Title III wire interception for Target Telephone 3 and authorized the Title III wire interception for (475) 251-9111 ("Target Telephone 4") used by CANADA for a period of 30 days. The interception of Target Telephones 3 & 4 began on March 29, 2024 and were terminated on April 30, 2023

24.     On May 2, 2024, United States District Court Judge Kari A. Dooley re-authorized the Title III wire interception for Target Telephones 3 and 4 used by CANADA for a period of 30 days. Those interceptions are ongoing.

25.     All of the proposed defendants except for Jimmy ARCE ("ARCE") for whom I am seeking arrest warrants participated in and/or were referenced in numerous intercepted communications over Target Telephones 3 and 4 (used by CANADA), which pertained to narcotics trafficking and which defined and confirmed the role each defendant in the drug trafficking organization. Though ARCE was observed on surveillance meeting with CANADA, ARCE is being charged in a separate drug conspiracy based on controlled buys and his interception over the telephone used by Omar PARRA.

26.     I have reviewed pertinent intercepted communications and/or corresponding call summaries/draft transcripts, in which the above-named defendants have participated in/or been referenced, in pertinent communications, and/or call summaries/draft transcripts, pertaining to the above referenced proposed defendants and Subject Premises and Subject Vehicles. A sampling of the pertinent communications intercepted during the investigation is set forth below.

27.     The intercepted communications, in some instances, are simply summarized to reflect the nature of the conversation, and are not necessarily a verbatim reproduction. In other instances, portions of the intercepted communications are set forth in quotation marks and reflect the actual words used by the participants, based upon the monitors initial line sheets, which are subject to revision. Unidentified males who participated in the intercepted calls are reflected below using the letters "UM." Unidentified females are indicated by the letters "UF." To the extent there are unintelligible portions, those portions are labeled, "UI." Finally, to the

extent that certain coded words or cryptic or slang phrases can be interpreted based on law enforcement agents training and experience, those interpretations are placed in parenthesis or are otherwise explained in the summary of the communication.

28.     Although communications intercepted during this investigation have sometimes been cryptic and/or coded, contemporary surveillance and other investigative methods, including, but not limited to the training and experience of your affiant, and information provided by cooperating witnesses or sources, have shed light on the meaning of the intercepted communications and confirmed their relationship to drug trafficking.  Finally, the calls included below are only a small sampling of the recorded calls and have been chosen particularly to highlight the particular criminal activity of each defendant.

29.     In addition to interception of wire and/or electronic communications, the investigation has, to date, involved numerous other investigative techniques, including but not limited to physical surveillance, the use of closed-circuit television, and other means. Evidence uncovered through these means also forms the basis for probable cause for the warrants your affiant is seeking.

IV.     **PROBABLE CAUSE FOR ARRESTS WARRANTS**

30.     As indicated above, the DEA is currently investigating the Rodney CANADA drug trafficking organization ("CANADA DTO"). The CANADA DTO, led by Rodney CANADA, is a Connecticut-based poly-substance drug trafficking organization that is actively distributing controlled substances in Connecticut and elsewhere. The investigation has utilized Title III wire intercepts of the CANADA telephones utilized by CANADA (as well as a telephone used by Omar PARRA) in conjunction with physical and electronic surveillance to obtain evidence of the CANADA DTO. The intercepts have revealed evidence that CANADA

is the head of the DTO and utilizes co-conspirators who facilitate the storing, processing, packaging and distribution of controlled substances including fentanyl, cocaine and cocaine base. As will be detailed in this affidavit, the intercepts have led to the "wall-off" seizures of cocaine and fentanyl from customers supplied directly by CANADA.

31.     As directly relevant to Rodney CANADA, there have been multiple pertinent intercepts in which CANADA firmly established his drug trafficking activities. For example, on February 29, 2024, in session 1549 on (203) 219-8218 (Target Telephone 3), during an outgoing call from CANADA to a customer of the CANADA DTO identified as Raul CASTILLO, CANADA literally told CASTILLO, "I got the drugs. Damn. You don't have me waiting with drugs. You don't have drugs. If they pull up on you... if they pull up on you, you good. Let me show you what I got. You see all this shit. I gotta drop all this shit off." I believe that CANADA was upset with CASTILLO for being late to a drug transaction in which CANADA was supplying CASTILLO with a quantity of drugs. CANADA was berating CASTILLO for making him wait as CANADA was the one who "got the drugs" and thus was taking the risk. I further believe that CANADA then showed CASTILLO the amount of drugs he had on him when he stated, "You see all this shit. I gotta drop all this shit off." Investigators conducting surveillance observed CANADA and CASTILLO meeting at the time of this intercepted conversation. I believe that CANADA and CASTILLO were just getting together at the start of the intercepted communication but CANADA never terminated the telephone call which explained how CANADA was able to show CASTILLO the drugs he had on him during the telephone call.

32.     CANADA has also been clear on the intercepted communications that he does not like to deal with small quantities of drugs (referring to both heroin/fentanyl and cocaine). In

session 5207 on Target Telephone 3, occurring on April 11, 2024, CANADA had an outgoing call with Julio SANTOS, who was identified on the intercepts as a subject who processes, stores and re-sells controlled substances for CANADA. During the intercepted communication, CANADA told SANTOS, "Yeah, that shit ain't none but making me hot. I can't fuck with that little shit no more." On April 15, 2024, in session 3048 on CANADA telephone (475) 251-9111 (Target Telephone 4), during an incoming call with an unidentified female (UF), CANADA told the UF, "Let me tell you this, I'm not them little niggas! Do not come to me for little shit! Talking about testing my patience. I don't do that shit." Similarly, in session 5701 on Target Telephone 3, on April, 2024, CANADA told Lamont COREY who was identified on the intercepts as a re-seller for CANADA that, "I'm not dealing with none of that little shit; 50, 100.. if is not a ball or better, don't call me," which I believe indicates that CANADA did not want to deal with anything less than 3.5 grams of cocaine, commonly referred to as an "8-ball" or "ball." In another example, in session 5965 on Target Telephone 3, on April 20, 2024, CANADA told an unidentified male subject (UM) that "That's why I don't deal with little shit like that no more because I don't like…that shit put me out there too much and I'm not going to places just to bring something for somebody for nothing. Like, nah, I'm not doing that like... I don't have time for".

33.     There was also photographic evidence of CANADA's drug trafficking activities captured over the wire intercepts. In data session 21769 on Target Telephone 3, on April 17, 2024, CANADA received an incoming text message from a subject identified as Michael HAVENS using (203) 223-9601 that read, "And I'm not being a whiny little bitch. But these things do add up over time." with the below image:



34.     The image displayed a white powdery substance that I believe is cocaine on a digital scale displaying the weight of 3.33.  I believe HAVENS was letting CANADA know that an "8-ball" or 3.5 grams of cocaine that he purchased from CANADA was only 3.33 grams, in other words, less than the 3.5 grams that HAVENS had purchased.

35.     The intercepted calls and other communications over the course of the wire (as detailed more below) have also made clear that CANADA uses a network of redistributors and that he also relies on certain sources of supply in brokered transactions. The CANADA DTO is a poly-substance drug trafficking organization involved in the distribution of heroin, fentanyl, cocaine and cocaine base. As will be detailed, subjects identified as CANADA, Terrell WILLS and Ramion BAKER coordinate the street level distribution of fentanyl, cocaine and cocaine base for the CANADA DTO. CANADA also sells bulk quantities of cocaine for redistribution including to resellers identified as Willi BAZELIAS and Christopher ADAMS, as well as a number of street level resellers in Stamford who coordinate the street level distribution of fentanyl, cocaine and cocaine base including Julio SANTOS, Lamont COREY a.k.a. "DJ", and Alvin NEWTON, a.k.a. "Butters."

36.     Though this affidavit is not specifying specific weight quantities distributed by CANADA for heroin, fentanyl, cocaine and cocaine base but merely detailing the probable cause that exists for arrest on a conspiracy to redistribute controlled substances under 21 U.S.C.

§§ 841(b)(1)(C) and 846, there are instances that I believe CANADA either identifies the specific substance that he is distributing or the investigation revealed the specific controlled substance that CANADA was distributing. For example, as to heroin/fentanyl, in session 2473 on Target Telephone 3 on March 7, 2024, a subject identified as Timothy SHANTZ who was utilizing telephone number (203) 252-6878, made an incoming telephone call to CANADA and during the intercepted communication, SHANTZ asked CANADA for "a bun [ph] and two (2) 50s." Following the intercepted communication, investigators conducting surveillance observed CANADA meeting with SHANTZ at a location in Stamford and following the meeting, Stamford Police conducted a "wall off" stop of SHANTZ and seized two knotted plastic bags that contained a white powdery substance that field tested positive for cocaine and 11 dosage units or "bags" containing a substance that field tested positive for fentanyl from SHANTZ. The bags were stamped with the label "Blackjack." The term "Blackjack" will be a common theme throughout this affidavit as CANADA references "Blackjack" in intercepted communications on multiple occasions regarding heroin/fentanyl. This seizure confirmed the intercepted communication that "bun," which I know in common drug vernacular is ten dosage units or bags of fentanyl or heroin, and that "two 50s" was for two fifty-dollar bags of cocaine.

37.     Similarly, in session 4082, on Target Telephone 3 on March 31, 2024, CANADA sent a text message to SANTOS that read, "Paper Tomorrow" followed by "110 each" in session 4097, on April 1, 2024. I believe "paper" is common drug vernacular for dosage units of heroin or fentanyl and $110 was the price for a "bundle" or 10 dosage units of heroin or fentanyl. In session 4099, SANTOS responded, "So I owe for one am I correct" meaning he owed CANADA for one bundle to which CANADA responded "Facts" or "right."

38.     As to cocaine and cocaine base, in Session 352 of Target Telephone 3 on February 23, 2024, CANADA received an incoming call from NEWTON. The following is an excerpt from the intercepted communication:

NEWTON:     I said that... I said that the shit you gave me earlier in the card... [Voices Overlap]

CANADA:     In the card?

NEWTON:     In the card! In the card!

CANADA:     Yeah, what about it.

NEWTON:     He was like, "Yo. What the fuck is this?  Yo, this shit like mixed or something? I think, or some shit like that."

CANADA:     Nah, I just gave that shit to you. That was the shit that was in the dresser. I just gave that shit... That wasn't not for you to give me nothing. For what?

NEWTON:     Yeah, but what is it though?

CANADA:     No, it's coke. It's coke! It was just mixed in the dresser. It probably got a little dirt and shit in it.

39.     I believe that this telephone call was confirmatory.  CANADA supplied NEWTON with cocaine or "coke." NEWTON, who functions as a re-seller for CANADA, indicated that he had a customer who complained about the quality of the cocaine when NEWTON stated, "He was like, 'Yo. What the fuck is this?  Yo, this shit like mixed or something? I think, or some shit like that." In session 607 on February 24, 2024, CANADA made an outgoing call to NEWTON who stated, "15 and five (5). I don't need that much soft." I believe that "15 and 5" was a reference to 15 grams of cocaine base and "5 grams of cocaine or soft" a common drug vernacular for powder cocaine.

40.     Similarly, in session 1532 of Target Telephone 4 on April 7, 2024, CANADA received an incoming telephone call from a subject identified as Robert MOORE utilizing telephone number 917-627-9864. The following is an excerpt from the intercepted communication:

MOORE:      Um... damn, let me um... I was about to say I might as well just do... 21 and 7.

CANADA:     21 and 7?

MOORE:      [UI]. What you call it? The uh... lesser [PH] of the soft.

CANADA:     [Audio Distortion]

MOORE:      Hard, 21. Playing blackjack, nigga, the hard one, you know? Tryna get that 21. Motherfuckers, man.

41.     In this call, I believe MOORE was asking CANADA for 21 grams of cocaine base or "hard" and 7 grams of cocaine or "soft." Similarly, other intercepted communications over Target Telephone 3 between CANADA and reseller Lamont COREY a.k.a. "DJ" who was using telephone number (203) 816-6816 further revealed that COREY arranges directly with CANADA for street level distribution of controlled substances by the CANADA DTO. There were numerous intercepted communications over Target Telephone 3 in which COREY asked CANADA for "40 cent" (sessions 1399, 2642), "45 cent" (session 2396), "50 cent" or "50" (sessions 1376, 1605, 1932, 2017, 2171, 2253, 2957, 4928, 5701, 6489) "60 cent" (session 2629, 4191), "80 cent" (session 6020), "90 cent" (session 4954), "buck" (sessions 2049, 6403) or even "Need. G" or "Need. One G" (sessions 459, 4339, 5314, 5867,) which I believe were instances in which COREY was asking CANADA for either a gram or "G" or the dollar amount of cocaine or cocaine base that he needed for his customers.

42. These are just some examples establishing CANADA's involvement in the narcotics conspiracy to distribute heroin, fentanyl, cocaine and cocaine base. More specifically intercepted communications have also revealed the involvement of Terrell WILLS a.k.a. "Black Fred", Ramion BAKER, a.k.a. "Ray Ray", Willi BAZELAIS, Christopher ADAMS, Gerald COLEY, a.k.a. "G-Rock", Benjamin DOZIER, Danny TURKVAN, a.k.a. "Smooth", and Jimmy ARCE a.k.a. "Boe,", a.k.a. "Slim," a.k.a. "Jimbo" and others as individuals associated with the CANADA drug trafficking organization and involved in the distribution of controlled substances. **Although I have reason to believe that CANADA is responsible for much higher quantities of narcotics, at this time, I am only seeking an arrest warrant for conspiracy to possess with the intent to distribute, and to distribute, heroin, fentanyl, cocaine and cocaine base, in violate 21 U.S.C. §§ 841(b)(1)(C) and 846.**

## Pertinent Communications with Terrell WILLS

43. Wire and electronic communications intercepted over Target Telephone 3 also revealed a drug trafficking relationship between CANADA and Terrell WILLS who has been utilizing telephone number (203) 554-5825. WILLS was identified as using this telephone number through calls in which his name was used and surveillance. As will be detailed below, WILLS is a trusted lieutenant in the CANADA DTO and a primary reseller of drugs (specifically, cocaine) supplied by the CANADA DTO. Because WILLS and CANADA have an established drug relationship, their pertinent drug related intercepted communications require minimal communication between them. WILLS has repeatedly asked CANADA for his "regular" which I believe is a daily resupply of drugs from CANADA to WILLS that he can then redistribute. For example, in Session 388 on February 23, 2024, CANADA received an incoming text from WILLS that stated, "Yo! Regular." Similarly, in Session 2007 on March 4, 2024, during an intercepted telephone call, CANADA asked WILLS, "Regular?" to which WILLS replied, "I

24

think it's two (2) though, two (2) of them." The exact amount of "regular" has not yet been determined in the investigation, but as indicated above, WILLS is believed to help CANADA to supply at least cocaine and cocaine base. The intercepted calls and messages show that CANADA and WILLS have a long established drug relationship and WILLS does not need to elaborate any further to CANADA other than to ask for "regular" or "two of them." Following this intercepted communication, investigators conducting electronic surveillance at CANADA's residence (**Subject Premises One**) observed WILLS arrive at the residence and subsequently depart **Subject Premises One**, which I believe was to pick up the "two of them" or a quantity of drugs.

44.      In Session 642, on February 24, 2024, during an incoming telephone call from WILLS, he asked CANADA for "a buck" to which CANADA replied, "A'right. I'm... I'm 'bout to come down there right now, so." I believe "a buck", similar to the intercepted communications with COREY represented a quantity of cocaine that cost $100 (though the exact weight of the cocaine is not known at this time). Following this intercepted communication, investigators conducting surveillance observed CANADA quickly meet with WILLS in Stamford, which I believe was for CANADA to provide "a buck" or a quantity of drugs to WILLS. In Session 1018 on February 26, 2024, WILLS called CANADA and told him, "Ain't shit, man. At the crib." CANADA responded, "I'ma 'bout to shoot you real quick." I believe that WILLS was out of drugs at his house or "crib" and CANADA was agreeing to resupply him.

45.      In Session 1491 on February 29, 2024, WILLS made an incoming call to CANADA and was discussing the drug arrest of Justin BROWN earlier that day. CANADA told WILLS, "I dropped him at the crib." To which WILLS replied, "I know he ain't come out that fast. I know he has to take a shower, chopped up, everything. I know he ain't come out that damn

fast, unless somebody hit him." I believe WILLS's reference to "chopped up, everything" was a reference to cutting or preparing a quantity of drugs. I further believe this intercepted communication shows the conspiratorial relationship between CANADA and WILLS as they were discussing BROWN's role in this DTO as someone who prepares and sells drugs for CANADA.

46.     In session 2309, on March 6, 2024, WILLS was called by CANADA and in pertinent part, WILLS said "had to shoot [U/I] out here. Sent somebody in Greenwich" and when CANADA asked where, WILLS clarified "[t]he same parking lot where we went go um, check last time." I believe that when WILLS stated "I had to shoot [U/I] out here. Sent somebody in Greenwich," he was saying that he had to send a runner to Greenwich to serve a customer.

47.     In Session 3382 on March 18, 2024, WILLS sent a text message to CANADA that read, "Need 2 until after 4 you know it's Monday" to which CANADA replied, "Ok pull up." I believe "Need 2" represented a quantity of drugs that has not been determined yet in the investigation and "Ok pull up" was CANADA telling WILLS to come to his house to pick up the drugs. In light of their relationship, WILLS did not need to elaborate any further to CANADA other than to ask for "2. In session 3434, WILLS told CANADA that he was "coming to grab that," which I believe was the "2" that WILLS had asked for in session 3382. Investigators conducting electronic surveillance at **Subject Premises One** subsequently observed WILLS arrive at the residence and depart approximately four minutes after arriving, which I believe was to pick up the "2" or a quantity of drugs.

48.     Following the March 28, 2024, reauthorization of Target Telephone 3, on March 29, 2024, in Session 3801, CANADA made an outgoing call to WILLS and during the intercepted communication, WILLS asked "you around" to which CANADA replied in the affirmative.

WILLS than stated, "I'm about to come and check you real quick," which I believe was WILLS using coded language to let CANADA know he was stopping by **Subject Premises One** to pick up a quantity of drugs. Following this intercepted communication, investigators conducting electronic surveillance of **Subject Premises One** observed WILLS arrive at the residence and depart approximately 9 minutes later, which I believe, was to pick up a quantity of drugs.

49.     Similarly, in session 4419 on April 3, 2024, CANADA received an incoming call from a subject identified as Gregory JONES using telephone number (203) 818-0526. In this call, JONES asked for "50 cents" to which CANADA replied, "I'ma send my man over there." JONES than stated, "NBA NBA basketball. Not an NBA basketball, I [Stammers]a hardball." CANADA replied, "Alright. I got you." I believe that "50 cents" and "hardball" was JONES asking in coded language for $50 worth of cocaine base.  Then in session 4425, CANADA told WILLS that "my man got 50" and to "go to Frienship." With these statements, I believe that CANADA was directing WILLS to conduct the drug transaction with JONES on his behalf. Subsequently, investigators observed via electronic surveillance WILLS travel to **Subject Premises One** where CANADA was located and then depart **Subject Premises One** less than two minutes after arriving. Investigators than surveilled WILLS to a location in Stamford and observed WILLS meet with JONES which I believe was for WILLS to deliver the $50 worth of cocaine base to JONES.

50.     On April 5, 2024, in session 4701, CANADA received an incoming call from a subject who identified himself as "Keith" a.k.a. "Bray Boy" who asked CANADA, "I got, uh... 50 cent, man," to which CANADA replied, "I ain't around right now." CANADA continued "I'll make a call for you." I believe "50 cent" represented $50 worth of cocaine.

51.     Then in session 4702, CANADA called WILLS and told WILLS, "Keith needs 50. I don't know if you wanna see 'Bray boy'" to which WILLS replied, "I don't got this 50 right here. I'ma have to come grab that from you." CANADA then told WILLS, "I'm at court right now," to which WILLS responded, "I'll get him with this then. He'll take it, a'right." I believe that WILLS did not have the full amount of drugs that "Keith" had ordered but had a smaller quantity that he planned on delivering to Keith.

52.     On April 6, 2024, in session 4799, CANADA made an outgoing call to WILLS and stated, "I need you to go see somebody. Wanna see somebody right quick?" and he continued, "Kwon D," to which WILLS replied, "Where he at?" CANADA then told WILLS, "You gotta come see me, though." In session 4800, WILLS sent a text to CANADA that stated, "Outside" which I believe indicated that WILLS was outside of **Subject Premises One**. In session 4802, CANADA received an incoming call from WILLS. The following is an excerpt of the intercepted communication:

| | |
|---|---|
| WILLS: | Yo, you talk to him? |
| CANADA: | Yeah, told him you coming right now. |
| WILLS: | No, where... where you tell him to go at? |
| CANADA: | I usually tell him meet me right there, um in that little, little joint right there. Little circle over there. |
| WILLS: | Yo, 'cause I usually meet him at PetSmart. [Muffled Voice] I just uh, I use to always go to PetSmart when I used to meet him for you. |
| CANADA: | You like that over there? That spot? |
| WILLS: | Yeah, it be crowded. That's the only way I go there. |
| CANADA: | A'ight, well you gotta pay attention every car around you. |
| WILLS: | I do. |

CANADA:    A'right  I'll tell him [Voices Overlap]

WILLS:     I don't care, I never stay there anyway. I pick him up and drive him.

CANADA:    A'ight, I'mma [U/I] and tell him to come there.

WILLS:     A'right.

53.    I believe that when WILLS stated, "I just uh, I use to always go to PetSmart when I used to meet him for you" that this again shows the ongoing conspiratorial relationship between CANADA and WILLS as WILLS was discussing previously meeting "Kwon D" at the "PetSmart" on behalf of CANADA. CANADA then told WILLS, "you gotta pay attention [to] every car around you," which I believe was CANADA reminding WILLS to be watchful of law enforcement at that location to which WILLS replied, "I don't care, I never stay there anyway. I pick him up and drive him," which I believe was WILLS telling CANADA that he only picks up the drug customer at that location but drives around to conduct the drug transaction, which is a common counter surveillance method employed by drug traffickers.

54.    In session 4807, CANADA made an outgoing telephone call to (860) 748-7851 and though the caller was not identified, based on the context of the conversation, I believe it was the subject that CANADA had referred to as "Kwon D" as CANADA told the caller, "Yo! Go to PetSmart. He's waiting for you." Immediately following this intercepted communication, in session 4808, CANADA received an incoming telephone call from WILLS. The following is an excerpt of the intercepted communication:

CANADA:    Black, he coming now. He on his - [Voices Overlap]

WILLS:     No, I know that. I'm just saying, what, what you, what you told him, though? I don't wanna tell him nothing different.

CANADA:    Uh I, I... I think 140, 150 or something like that.

> WILLS:     A'ight, I'ma see, You know what I'm saying, I'ma tell him, I'm tell him that. A'right.
>
> CANADA:    I think 140. 150. You see whatever he gives you and just bring a hunnit [PH].
>
> WILLS:     Uh hu,  A'right.

55.    I believe when CANADA stated, "Black, he coming now." that CANADA was telling WILLS that "Kwon D" was on his way to the PetSmart to meet WILLS. WILLS then responded, "what you told him, though? I don't wanna tell him nothing different." This statement is also important because I believe it indicates CANADA's leadership role in the organization. Aside from directing WILLS to a drug transaction, CANADA was also coordinating prices with the customer as CANADA responded, "I think 140, 150 or something like that."

56.    Investigators conducting surveillance observed WILLS at the PetSmart location at 288 West Ave., Stamford, CT quickly meeting with an unidentified male subject who arrived and departed on foot. I believe the male subject was the subject that CANADA referred to as "Kwon D" who had ordered a quantity of drugs from CANADA.

57.    Following this surveillance, in session 4815, WILLS sent a text to CANADA that stated, "Regular" which again I believe was WILLS asking for his "regular" resupply of drugs. These are just some examples establishing both WILLS and CANADA's involvement in the narcotics conspiracy. **As a result of these calls, and numerous other communications, as well as surveillance and other information learned throughout the course of this investigation, I have probable cause to believe and do believe that WILLS conspired to distribute cocaine and cocaine base as a result of his role in the conspiracy in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.**

**Pertinent Communications with Christopher ADAMS**

46.     Wire and electronic communications intercepted over Target Telephone 3 also revealed a drug trafficking relationship between CANADA and Christopher ADAMS, who has utilized telephone numbers (203) 829-6582 and (203) 564-3749. Both numbers were tied to ADAMS through surveillance, as well as recorded calls. As will be detailed below, over the course of the wire, ADAMS purchased controlled substances from the CANADA DTO and was arrested on March 8, 2024, subsequent to a "wall off" seizure of approximately 80 grams of cocaine that was supplied by the CANADA DTO. During Session 415 on February 23, 2024, CANADA telephoned ADAMS who was utilizing telephone number (203) 829-6582 and ADAMS told CANADA, "Um, I got 16 for you. But I want, but I owe you, what? five (5) something?" to which CANADA responded, "[y]ou owe me five (5) so yeah." I believe that ADAMS was telling CANADA that he had $1,600 or "16" in drug proceeds to give to CANADA from a total balance of $5,000 or "5" owed. CANADA then asked ADAMS, "I give you 50?" I believe this was CANADA asking ADAMS if he needed 50 grams of cocaine. ADAMS responded in the affirmative.

47.     Following this intercepted communication, investigators surveilled CANADA to a hotel in Norwalk, CT where ADAMS was staying and observed CANADA quickly meet with ADAMS in the parking lot of the hotel. I believe, based on the intercepted communications, that CANADA collected the $1,600 from ADAMS. Investigators were unable to follow CANADA as he left the hotel, but electronic surveillance of Target Telephone 3 revealed that CANADA travelled immediately to the Bridgeport area and then immediately returned to the hotel where ADAMS was staying. CANADA's return to the hotel was confirmed in Session 481 when ADAMS texted CANADA, "Hey, cuz [ph] I'm about to come to the back door." I believe

31

CANADA's travel to Bridgeport was to pick up the 50 grams of cocaine that he delivered to ADAMS on his return trip to the hotel.

48.    In Session 617 on February 24, 2024, CANADA made an outgoing call to ADAMS and asked ADAMS, "Where you at the crib?" to which ADAMS responded in the affirmative. Investigators then surveilled CANADA back to the hotel in Norwalk where ADAMS was staying and again observed CANADA and ADAMS meet in the parking lot of the hotel. Following that meeting, in Session 634, CANADA received an incoming call from ADAMS. During the intercepted communication, CANADA stated, "was it 100, Nigga, you know what it was, man," to which ADAMS responded in the affirmative. It was unclear what spurred this communication, but based on my experience and training and information learned throughout the course of this investigation, I believe CANADA had delivered a quantity of drugs to ADAMS which equaled 100 or 100 grams.

49.    Then in Session 2500 on March 7, 2024, CANADA received an incoming call from ADAMS who asked CANADA, "you around?" CANADA responded, "[y]eah, I'll definitely come out that way. What street I'm coming off?" to which ADAMS responded, "80th". Investigators again surveilled CANADA back to the hotel in Norwalk, CT and observed CANADA meet with ADAMS in the parking lot of the hotel.

50.    On the following day, March 8, 2024, members of the Norwalk Police Department executed a search warrant for ADAMS's room at the hotel. The probable cause for the search warrant was based on probable cause that Norwalk Police had developed that was independent from the wiretap so as to protect the wiretap though the search warrant was executed at the request of DEA investigators. Norwalk police seized approximately 80 grams of cocaine from ADAMS's room which I believe represented the cocaine provided to ADAMS from CANADA on March 7,

2024, and was the "80th street" that ADAMS asked CANADA for. ADAMS was arrested on state charges by Norwalk Police, has since been released and almost immediately resumed communications with CANADA over a different telephone number. Norwalk Police conducted a post-arrest interview of ADAMS who did not identify CANADA as the source of the seized cocaine. Norwalk Police did not mention CANADA to ADAMS to protect the investigation.

51.   In Session 3280 on March 17, 2024, CANADA received an incoming call from ADAMS on (203) 564-3749, a telephone he acquired following his arrest. The following is an excerpt of the intercepted communication:

ADAMS:   Nothing, man. I just found out some information about that motherfucker that lined me up.

CANADA:   That ratted you out?

ADAMS:   Yeah, that nigga had [Stammers] he had some gun charges, he got caught with a bunch of stolen guns.

CANADA:   Oh... yup.

ADAMS:   Yup. And my boy just told me, he said- I didn't even know nothing about it. He said, yeah, he said 'I kept wondering how that nigga beat that case like that . No jail time, no nothing.'

CANADA:   Yeah, he set you up. Which one was it?

ADAMS:   The white, the white boy, Frankie.

52.   I believe that, in this call, CANADA and ADAMS were trying to figure out the confidential informant who set up ADAMS resulting in the drug arrest or the person who "line[d] me up" who ADAMS believed was "the white boy, Frankie."

58.    Despite ADAMS' arrest, his drug trafficking relationship with CANADA continued. In session 6172 on April 22, 2024, CANADA made an outgoing telephone call to ADAMS. The following is an excerpt from the intercepted communication:

ADAMS:      You around?

CANADA:     Of course. Always for you.

ADAMS:      Oh. I'm trying to see [U/I] um... at exit 40.

CANADA:     A'right. 40?

ADAMS:      Yeah.

CANADA:     A'right.

59.    Similar to ADAMS' reference to "80th" street in session 2500, I believe "exit 40" was coded language for 40 grams of cocaine that ADAMS was ordering to which CANADA replied in the affirmative.  Based on these communications and surveillance and other similar communications and surveillance, I have probable cause to believe, and do believe, that ADAMS **conspired with others to distribute cocaine and cocaine base as a result of his role in the conspiracy in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.**

**Pertinent Communications with Ramion BAKER**

60.    Wire and electronic communications intercepted over Target Telephone 3 also revealed a drug trafficking relationship between CANADA and Ramion BAKER who has been utilizing telephone numbers assigned (203) 667-8287 and 203-561-7196. These numbers were linked to BAKER through recorded calls in which he was identified by name or nickname on recorded calls and surveillance. BAKER was not intercepted as frequently as many of the lower level members of the CANADA DTO and many of the intercepted telephone calls with BAKER involved BAKER and CANADA's discussions of them meeting but without any further

34

explanation for the meeting as they were very careful in their communications. Nonetheless, the below evidence shows that BAKER has played a vital role in the conspiracy.

61.    For example, on February 25, 2024, CANADA made an outgoing telephone call to BAKER at (203) 667-8287. During the intercepted communication in which CANADA and BAKER discussed BAKER getting into an argument at a bar, CANADA stated, "You getting drunk and going to the fucking Elk's like that, man." BAKER replied, "Oh, nah. Listen! The Taurus was close. I wasn't stupid." I believe BAKER wasn't worried about the argument as he had a "Taurus" handgun that he keeps "close" to him. In Session 1486 on February 29, 2024, CANADA received an incoming telephone call from BAKER. The following was an excerpt from the intercepted communication:

| | |
|---|---|
| CANADA: | Peace [U/I] |
| BAKER | Peace [U/I]. They just got your man yo. |
| CANADA: | Who? |
| BAKER: | [Aside: Hey girl.] Jus [ph] |
| CANADA: | They did?! |
| BAKER: | Yup. Nigga [U/I] that's what I just said, I can't do cause nigga make rookie mistakes [U/I].  This nigga caught lying [U/I] this up man. |
| CANADA: | Oh [U/I] |
| BAKER: | Yup. This my first time being hand up like, you know what I'm saying? Ever! [U/I] man. |
| CANADA: | Oh my god man! [Voices Overlap] |

62.    As indicated above, prior to this intercepted communications, Stamford Police had arrested Justin BROWN a.k.a. "Jus", a.k.a. "Just" for possession of cocaine base after receiving a complaint of drug dealing on a local street.  BAKER was with BROWN when BROWN was

approached by the police.  As will be detailed later in this affidavit, evidence obtained during the investigation identified BROWN as a street level re-seller for CANADA.  I believe that when BAKER stated, "They just got your man yo" that BAKER was confirming the BROWN worked for CANADA to which CANADA replied, "Who?" showing that CANADA has multiple people working for him. BAKER confirmed he was talking about BROWN as he referred to him as "Jus." I believe that BAKER being with BROWN while BROWN was conducting drug related business for CANADA and identifying BROWN to CANADA as "your man" shows BAKER's intimate knowledge of the CANADA DTO and members of the conspiracy.

63.    In Session 1731 on March 2, 2024, CANADA received an incoming call from BAKER in which they discussed a subject named "Marvin" who had passed away. BAKER told CANADA, "Marvin passed away" and then stated, "Damn, that shit... that means... gon' be more fiends out there for us." I believe that BAKER was referring to the death of Marvin FOSTER (natural death) who according to the Stamford Police was a local drug dealer. I further believe that when BAKER stated, "that means... gon' be more fiends out there for us," that BAKER was callously stating that he and CANADA would have additional customers or "fiends" since FOSTER had died. Further, BAKER stated, "more fiends for us" meaning BAKER and CANADA were conspirators as members of the CANADA DTO. In Session 2022 on March 4, 2024, CANADA received an incoming call from BAKER. The following is an excerpt from the intercepted communication:

> BAKER:      Hey G, this ain't, is it Fairfield?
>
> CANADA:     No, it's right over Fairfield Ave, uh, Hollister and Fairfield.
>
> BAKER:      Yeah, I been on Fairfield, this shit, I ain't see no Hollister. Like, like what, like what, what part of [Voice Overlap]

| | |
|---|---|
| CANADA: | A'ight, come, come, come down State Street right? [Pauses] Not State, come down... um [Sucks Teeth] um, uh, come down um, Seaside... [Stammers] Connecticut and Hollister, I'm, my bad bro, I'm buggin', Connecticut Ave [Voice Overlap] |
| BAKER: | Yeah. Alright I'm right here. |
| CANADA: | You coming off Stratford Ave. and you gonna see Hollister, come, come on Hollister, it's called Hollister and Connecticut Ave. I'm fucking buggin' bro. |
| BAKER: | Hollister and Connecticut? |
| CANADA: | Yeah. Connecticut Avenue on Hollister Ave. |
| BAKER: | Alright. |

64.    I believe that CANADA was directing BAKER to a location at "it's called Hollister and Connecticut Ave," which I know is an intersection located in Bridgeport, CT. Based on this communication, investigators travelled to that intersection and observed BAKER in his vehicle departing a residence located on Hollister Ave near the corner of Connecticut Ave. It was only approximately 20 minutes from the time of Session 2022 until investigators observed BAKER at Hollister Ave. I believe based on my training, experience and knowledge of this investigation that BAKER travelled to that location in furtherance of his drug trafficking activity with CANADA. This belief is further re-enforced as on the following day, March 5, 2024, based on both electronic and physical surveillance, CANADA also travelled to the area of Hollister Ave and Connecticut Ave for a total of approximately four minutes before returning to Stamford. I believe these two quick trips by BAKER and CANADA were in furtherance of their drug trafficking activities.

65.    Similarly, in Session 2518 on March 7, 2024, CANADA received an incoming call from BAKER. The following is an excerpt of the intercepted communication:

| | |
|---|---|
| CANADA: | Where you at? |

| BAKER: | Busy. |
| CANADA: | I needed a bundle. |
| BAKER: | Huh? |
| CANADA: | I needed a B [ph]. A whole B one (1). |
| BAKER: | I ain't put nothing together yet. |
| CANADA: | Yeah...I did some wild shit bro'. |
| BAKER: | [U/I] did some wild shit too. He said he gonna holla at you. |
| CANADA: | [Laughs] Yup, I washed all this shit in the washer machine. |

66.     I believe that CANADA was asking BAKER for "a bundle" of fentanyl to which BAKER replied that, "I ain't put nothing together yet." In this conversation, I believe BAKER was telling CANADA that he had not yet processed his fentanyl for street distribution. Further, I believe this intercepted communication shows the close conspiratorial relationship between CANADA and BAKER as CANADA knows to call BAKER to obtain fentanyl in a hurry.

67.     In session 5610 on April 15, 2024, CANADA received an incoming call from BAKER who was now using (203) 561-7196. During the intercepted communication, BAKER told CANADA, "we got, we got to give (U/I) the money, yo! 'Cause I, I, I think I'mma, I'mma leave tonight." CANADA had told BAKER during the intercepted communication that he was at "Merrell Park" in Stamford. Following this intercepted communication, investigators observed CANADA quickly meet at Merrell Park in Stamford, which I believe was for BAKER to provide "the money," which I believe was drug proceeds to CANADA.

68.     Then on April 30, 2024, investigators utilized a confidential witness (CW-1) to conduct a controlled purchase of fentanyl from BAKER.  CW-1 has been a confidential source for the Stamford Police Department since 2017 and has continuously provided truthful and

reliable information to the SPD. CW-1 is providing information and services to the SPD in exchange for financial compensation. At the direction of investigators, CW-1 made a consensually monitored and recorded telephone call to BAKER on (203) 561-7196, the telephone number intercepted over Target Telephone 3. During the telephone call, BAKER directed CW-1 to meet him on Clinton Avenue in Stamford. Investigators established surveillance in the vicinity of Clinton Avenue in Stamford. Prior to the controlled purchase, CW-1 and CW-1's vehicle were searched for contraband with negative results. CW-1 was provided with a quantity of buy money. The serial numbers to the buy money were recorded prior to the buy. CW-1 was equipped with a kel recorder.

69.     Investigators surveilled CW-1 from a neutral location to the meeting location on Clinton Avenue. Investigators observed BAKER exit an apartment building at 40 Clinton Avenue, and meet with CW-1 inside of CW-1's vehicle. Investigators further observed BAKER leave the CW-1's vehicle, reenter 40 Clinton Avenue, Stamford, CT, exit the building a few minutes later and re-enter the CW-1's vehicle. A few moments later, investigators observed BAKER exit CW-1's vehicle. Investigators then surveilled CW-1 back to the neutral location and at the neutral location, CW-1 turned over the kel recorder and 11 dosage units or loose "bags" that were stamped with "Black Jack." The substance contained within one of the dosage units was field tested positive for the presence of fentanyl.

70.     CW-1 told investigators that BAKER had six dosage units of fentanyl on him when he initially entered CW-1's vehicle and went to retrieve the additional five dosage units when BAKER left CW-1's vehicle the first time and investigators observed BAKER entering 40 Clinton Avenue. BAKER returned to CW-1's vehicle and provided the 5 additional dosage units

after returning from 40 Clinton Avenue. The 11 dosage units (suspected to be fentanyl) were subsequently submitted to the DEA laboratory in New York City for confirmatory analysis.

71.     As will be detailed later in this affidavit, on March 7, 2024, investigators conducted a "wall off" stop and seized dosage units of fentanyl containing the "Black Jack" stamp from a subject intercepted on Target Telephone 3 and subsequently identified as Timothy SHANTZ. SHANTZ had been provided the fentanyl in the "Black Jack" stamp directly by CANADA. Further, as will also be detailed, the investigation has revealed probable cause to believe that Benjamin DOZIER supplied the fentanyl in the "Black Jack" stamp to CANADA and on March 15, 2024, after meeting with DOZIER in Bridgeport, CANADA sent several text messages that read, ""Black Jack back" which I believe was CANADA telling customers of the CANADA DTO that he had been resupplied with fentanyl stamped with the "Black Jack" logo. All of this further corroborates that BAKER, as a member of the conspiracy, was selling the fentanyl with the "Black Jack" logo in furtherance of the conspiracy.

72.     Investigators later retrieved surveillance video from 40 Clinton Ave and observed that BAKER entered apartment 301 when he retrieved the additional dosage units of fentanyl for CW-1.

73.     Then on May 3, 2024, investigators utilized CW-1 to conduct a second controlled purchase of fentanyl from BAKER. At the direction of investigators, CW-1 made a consensually monitored and recorded telephone call to BAKER on (203) 561-7196, the same telephone number intercepted over Target Telephone 3. During the telephone call, BAKER directed CW-1 to meet him on Clinton Avenue in Stamford. Investigators established surveillance in the vicinity of Clinton Avenue in Stamford. Prior to the controlled purchase, CW-1 and CW-1's vehicle were searched for contraband with negative results. CW-1 was provided with a quantity of buy money.

The serial numbers to the buy money were recorded prior to the buy. CW-1 was equipped with a kel recorder. Investigators surveilled CW-1 from a neutral location to the meeting location on Clinton Ave. Investigators observed BAKER again exit 40 Clinton Ave. and meet with CW-1 inside of CW-1's vehicle. Again, investigators further observed BAKER leave the CW-1's vehicle, enter an apartment building at 40 Clinton Avenue Stamford, CT, exit the building a few minutes later and re-enter the CW-1's vehicle. A few moments later, investigators observed BAKER exit CW-1's vehicle.

74.     Investigators then surveilled CW-1 back to the neutral location and at the neutral location CW-1 turned over the kel recorder and 31 dosage units or loose "bags." The bags were blue in color and not stamped with the "BlackJack" logo but according to CW-1, he asked BAKER if it was the same stuff as last time, meaning fentanyl purchased during the April 30, 2024 controlled purchase to which BAKER told CW-1 in sum and substance that it was the same stuff just in a different package. The substance contained within one of the dosage units was field tested positive for the presence of fentanyl.

75.     CW-1 told investigators that BAKER had 11 dosage units of fentanyl on him when he initially entered CW-1's vehicle and went to retrieve the additional 20 dosage units when BAKER left CW-1's vehicle the first time and investigators observed BAKER entering 40 Clinton Avenue. BAKER returned to CW-1's vehicle and provided the 20 additional dosage units after returning from 40 Clinton Avenue. The 31 dosage units were subsequently submitted to the DEA laboratory in New York City for confirmatory analysis.

76.     **As a result of these calls and other similar ones throughout the course of the investigation (including others detailed below) as well as surveillance and other information, I have probable cause to believe and do believe that BAKER conspired with others in this**

DTO to possess with intent to distribute and to distribute heroin and fentanyl, cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.

### Pertinent Communications with Willi BAZELIAS

77.    Wire and electronic communications intercepted over Target Telephone 3 also revealed a drug trafficking relationship between CANADA and a subject identified as Willi BAZELAIS, who was utilizing telephone number (475) 755-2127. This telephone number was tied to BAZELAIS through recorded calls in which he was identified by name and surveillance. For example, in Session 829 on February 24, 2024, CANADA received an incoming text from BAZELAIS that read, "50 soft 50 hard" which I believe, based on my training, experience, knowledge of this investigation, including subsequent intercepted communications with BAZELAIS, that BAZELIAS was placing an order to CANADA for 50 grams of cocaine and 50 grams of cocaine base. Similarly, in Session 949 on February 25, 2024, CANADA received an incoming text from BAZELIAS that read, "40 hard ten soft for the 50 big bro nd this week I clear most of it for sure." I believe that in this text, on Target Telephone 3, BAZELAIS was asking CANADA for 40 grams of cocaine base or "hard" and 10 grams of cocaine or "soft" to which CANADA responded in Session 950, "I'll see you tomorrow bro."

78.    The following day, February 26, 2024, BAZELAIS sent CANADA a text message in Session 984 that read, "I grab that I'll be at 39 ima handle that wensday I clear most of it or will be clear got everything in motion now." I believe that when BAZELAIS received the 40 and 10 from CANADA that he would owe CANADA $3,900 or "39" but will "handle that wensday" meaning pay CANADA the $3,900 by Wednesday.

79.    Later that day, in Session 1012, CANADA made an outgoing call to BAZELAIS and told BAZELAIS, "I meet you at your house right now." Investigators surveilled CANADA

to the parking lot of an auto parts store in Stamford located down the street from BAZELAIS's residence and observed CANADA and BAZELIAS quickly meet before BAZELIAS walked to his nearby residence. I believe this meeting was for CANADA to provide BAZELAIS with the 40 grams of cocaine base and 10 grams of cocaine.

80.    In session 2784, on March 11, 2024, CANADA sent a text to BAZELAIS that read, "Damn going on 3 weeks and you can't even respond back to me when I call SMH. That's it for me just get me that bread soon bro. Either have that bread for me today or we gonna have a real good talk. I hate when niggas can't respond back but will hit a fiend right back and I'm supposed to be your plug foh. This shit just pissing me the fuck off bro."  I believe in this conversation that CANADA was trying to get money owed for narcotics ("bread") from BAZELAIS. Similarly, in session 2785, BAZELAIS wrote "Ima get wit chu u big bro lil last min clean alot shit been goin on the block had to switch up been in the port tryna make it happen 3 nikkas ode by the green I no it wasn't my work but tryna play it safe gettin the last bite gon than im pull on u."  In this message, CANADA referred to switching locations where he was selling and noted that three people had overdosed ("3 nikkas ode") "by the green" although not from his drugs ("I no it wasn't my work"), but he emphasized that he was trying to play it safe.

81.    In session 3781 on March 21, 2024, CANADA sent BAZELIAS a text message that read, "Holla at me bro. If you need to get right and get back right so you could pay this off, then hit me back in a few minutes dead ass." In this call, I believe that CANADA was continuing to collect the drug debt owed to him by BAZELIAS. On March 29, 2024, in session 3860, CANADA sent another text to BAZELIAS that read, "Don't do this shit today bro bring me the bread today" which I believe was again CANADA trying to collect a drug debt or "bread" from BAZELIAS who responded in session 3861, "Not at all big bro I Wass wit my pops wen u call I

43

just bout to call u back real shit ima collecting ima hit chu tonight or 2marrow for sure ima give sumthin no games." When BAZELIAS wrote, "ima collecting" he was indicating that BAZELIAS was collecting the drug proceeds he owed to CANADA. Then in session 4589 on April 4, 2024, CANADA sent a text message to BAZELIAS that read, "[y]o bro don't worry about the bread just keep it but be careful in these streets from now on!!! I can't stop ppl from doing what they wanna do!!!! Be very careful my nigga my word!!! I'm a show you how you do a nigga real bad for constantly disrespecting you!!!!" which I believe was CANADA threatening BAZELIAS for not paying the drug debt to which BAZELIAS responded, "Big nah never disrespect I just tryna get every dollar I owe u because I respect u I do understand how u fill 100 % I swear I'm was tryna bring 2k Friday." In this call, I believe that BAZELIAS was promising CANADA that he would bring him $2000 or "2K" by "Friday." On April 11, 2024, in session 5210, BAZELIAS made an incoming call to CANADA. The following was an excerpt of the intercepted communication:

BAZELAIS:  Hello [Voices Overlap]

CANADA:  Bro, what going on these days you're supposed to be hitting me. What's going on, bro', bro'?

BAZELAIS:  Nah, I'm just sa- I'm trying to make... Know what I mean? I don't wanna just pull up with you , give you 200, three (3)... You know what I'm saying?

CANADA:  Actually, if you gotta give three (3), 400 a day, I take, bro', but somethin' gotta give, man. I can't just keep. You keep buying these little bullshit ass pocket ass gram for these niggas.

BAZELAIS:  I'm buying it off Slez'cause he saying he getting it off you!

82.    I believe that when BAZELIAS stated, "I don't wanna just pull up with you, give you 200, three (3)" that BAZELIAS was telling CANADA that he did not just want to pay CANADA only $200 or $300 at a time to pay off his drug debt owed to CANADA to which CANADA responded, "'if you gotta give three (3), 400 a day, I take, bro.'" CANADA then stated to BAZELIAS, "[y]ou keep buying these little bullshit ass pocket ass gram for these niggas." In this call, I believe that he was referring to gram quantities of cocaine or cocaine base to which BAZELAIS responded, "I'm buying it off Slez 'cause he saying he getting it off you!" which I believe BAZELIAS was telling CANADA that he was buying gram quantities of drugs from "Slez" because BAZELIAS believed "Slez" was a re-seller for CANADA. The conversation continued:

CANADA:       You're, but [Voices Overlap]

BAZELAIS:    Ain't buying [U/I] [Voices Overlap]

CANADA:       You're buying grams from Slez?

BAZELAIS:    Yeah. That's the only, that's the only person I'm getting it off. I can't get it off nobody else. I [Stammers] always get it off Slez. 'Cause he told me he getting form you. He get a couple balls and I a couple grams. And I'm trying to build that, you know what I'm saying? Whenever I'm out there. And then, I'm just gonna, know what I mean? Put it out to the the side. And then on Friday...

CANADA:       Right.

BAZELAIS:    I'm doing that every Friday, I just give you... know what I'm saying? Whatever I got. I got this [U/I] you know what I'm saying?

CANADA:    Bro,' let me tell you something. I'ma tell you a flaw you got. You party too much. You [Stammers] You spend too much money. There's no way I'm giving you 100 grams,150 grammies.

83.    I believe when CANADA stated, "You spend too much money. There's no way I'm giving you 100 grams,150 grammies" that CANADA was telling BAZELIAS that he would no longer be giving him 100 or 150 grams of cocaine because of BAZELIAS's spending habits which CANADA believed led to BAZELIAS owing CANADA money. The conversation continued:

BAZELAIS:    No. What had happen was... I didn't even tell you what happened. She..What happened was, I didn't... Is not like I really, like, actually, like, fucked it up. 'Cause you know, every time I got the work, I always come back and I give you that. This right right here, this was a mistake that happened on me. I left one work out, my mom ends up finding the shit.

CANADA:    I remember that, but I gave 14 grams after that. What the fuck happened? You couldn't move 14 grams after that?

BAZELAIS:    Ain't gonna lie, that shit. I was moving it... But I tried to, you know what I mean? the shit... Just know I got you. Today, I could get you something you know what I'm saying? 'Cause this, off this gram, I'm about to just... I'm about to go , you know what I mean? I could just give you 100 and then.. you know what I mean? Keep doing that. All day. A'int gonna lie. [Pause] 'Cause, I'm about to go to the green right now. [Voices Overlap]

CANADA:    Something gotta give, Will. 'Cause if I knew this, I would have never gave out this much, honestly. If I knew it gon' to be like this [Voices Overlap]

BAZELAIS:   No! It wasn't, it wasn't even my fault. It [Stammers] all happened so fast. It wasn't... Like, that mistake just happened. 'Cause I never fucked it up. That's what I'm saying. It was never like, 'oh, I fucked up the work.' No, uh-uh. Nah! I always had... [Stammers] If I had less money, I always had to work to pa-, you know what I'm saying? I always had to get that right. And then, that why I was always able to get that every time. You know what I'm saying? That's what I'm saying; this has put me in uh, this shit has just fucked me up, bad. know man? Bad. So... that's why I'm just trying.. just trying to get it right, man. Get back u u , cuz. I got every thing percolating I can't even make the move, I'm jsut letting Slez [U/I] up everything, you know what I'm saying?

CANADA:    Well, get at me, man.

BAZELAIS:   Yeah, I got you. 100%, bro'.

CANADA:    Get at me. Get at me today, baby boy.

BAZELAIS:   I got you.

CANADA:    Alright. Baby, boy.

BAZELAIS:   I got you.

84.     I believe when BAZELIAS stated, "[t]his right right here, this was a mistake that happened on me. I left one work out, my mom ends up finding the shit." In this call, BAZELIAS

was telling CANADA that a quantity of drugs or "work" that CANADA had supplied BAZELIAS had been discovered by BAZELIAS's "mom" to which CANADA replied, "I remember that, but I gave 14 grams after that. What the fuck happened? You couldn't move 14 grams after that?" Here, CANADA was saying that he had given BAZELIAS fourteen grams of cocaine after BAZELIAS's mother had found the prior stash to which BAZELIAS responded, "Ain't gonna lie, that shit. I was moving it... But I tried to, you know what I mean? the shit... Just know I got you."

85.     As a result of these calls and other similar ones throughout the course of the investigation as well as surveillance and other information, **I have probable cause to believe and do believe that BAZELIAS conspired with others in this DTO to possess with intent to distribute and to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.**

### Pertinent Communications with COLEY

86.     Wire and electronic communications intercepted over Target Telephone 4 also revealed a drug trafficking relationship between CANADA and Gerald COLEY ("COLEY") who was using telephone number (203) 243-6934. This number has been tied to COLEY through physical surveillance and voice identification on calls. COLEY resides at **Subject Premises Six** and as will be detailed below, is a reseller and broker for drug transactions for the CANADA DTO. This has been established through calls and surveillance. For example, in session 470 on April 1, 2024, CANADA received an incoming telephone call from COLEY. The following is an excerpt from the intercepted communication:

CANADA:     Where you at?

COLEY:     I'm at the top; I'm coming down yo.

| | |
|---|---|
| CANADA: | Wait, cause I gotta come up there soon |
| COLEY: | What time? |
| CANADA: | I don't know but, I just gotta grab... I gotta grab that bread from you man; then I'ma handle that |
| COLEY: | Say that again. |
| CANADA: | Say, I'ma come grab that bread from you right quick. |

87.     I believe "at the top" is code for Bridgeport where Subject Premises Six is located and that COLEY was indicating that he was "coming down" to Stamford. I further believe that when CANADA stated, "I'ma come grab that bread from you right quick" that CANADA was traveling to COLEY to pick up a quantity of drug proceeds or "bread" from COLEY. The conversation continued:

| | |
|---|---|
| COLEY: | A'ight. I'm gonna link up with you today, but I'm coming down to do something.  You already know why I'm coming down. |
| CANADA: | [Background: Voices] Oh, a'right. |
| COLEY: | That's why I said I'm coming down and I'm gonna ... I'm gonna um... I'm gonna get a better number for you. |
| CANADA: | For me? |
| COLEY: | Yeah! |
| CANADA: | Of [ph]  what? |
| COLEY: | What you think?  Come on, if I said I'm gonna get a better number for you, you already know my nigga. You smart. |
| CANADA: | Call me then. [ph] |
| COLEY: | A'ight, you already know . |
| CANADA: | No, no, call me um. |

49

| COLEY: | Oh! |
|---|---|
| CANADA: | Yeah! |
| COLEY: | On the other phone? |
| CANADA: | Yeah! |
| COLEY: | A'ight. |

88.     Based on my experience and training and information learned throughout the course of this investigation, in this communication, COLEY indicated that he was planning to travel to attend a drug related meeting as COLEY then stated, "Come on, if I said I'm gonna get a better number for you, you already know my nigga. You smart." I believe that COLEY was trying to get a better price or "number" from a drug source to supply CANADA.

89.     Later on April 1, 2024, in session 472, COLEY made an incoming telephone call to CANADA. The following is an excerpt from the intercepted communication:

| COLEY: | Yeah! but you already know what I'm talking about man.  I'm going down there; you see my man call me this morning. |
|---|---|
| CANADA: | [Background: Voices] |
| COLEY: | Nah, not, not [U/I]. My other man. |
| CANADA: | Who, From where? |
| COLEY: | He's from [U/I]  Valley man. My nigga Val [ph] |
| CANADA: | Oh shit. |
| COLEY: | Yeah!  Told you that nigga poppin' man. That nigga got a joint. He got a flower shop.  I'ma ask him  [U/I] for you. He asked me  [U/I] job too.  That nigga got a flower shop right around the corner from the Apollo nigga. |
| CANADA: | Oh word. |

COLEY:      Yeah!

CANADA:     Shit. that's what's up.

COLEY:      Yeah, that nigga, that nigga... man these niggas, they fuck with me man. That's why I'm going down there. He was like, 'Yo, come fuck with me [U/I.' I already told him I'm going down. Cause he was like, 'Yo, what's going on up there?' I was like, 'I'm coming down and fuck with you, for a minute.' So I was like, 'You already know today is the first so I [U/I] for a minute, but... I got all my debts in order. But we gonna wait today on that... on that other thing.'

CANADA:     Huh?

COLEY:      He definitely coming today on that other thing.

CANADA:     Hey, big boy, you broke up

COLEY:      I said, I told him I'ma come fuck with him for a minute cause today is the first but I got my... I got all my debts in order.

CANADA:     A'ight.

COLEY:      I got all my debts in order so when I call you, I'ma ... just be ready for me. I'ma be ready for you. It'll be today though.

CANADA:     A'right, say less.

COLEY:      A'ight.

CANADA:     A'right.

COLEY:      A'right one.

90.    I believe that COLEY was traveling to meet, "My nigga Val" who "got a flower shop right around the corner from the Apollo nigga." I know from my time working with the DEA in New York City, that the Apollo theater is a venue in Harlem. I believe this was a drug related meeting as COLEY then told CANADA, "I got all my debts in order so when I call you, I'ma ... just be ready for me. I'ma be ready for you. It'll be today though." In this call, I believe that

COLEY was referring to receiving a quantity of drugs for CANADA. Then in session 474, COLEY placed an incoming telephone call to CANADA and told CANADA "Yo, I'ma get up with you, I'ma get up with you, um... Shit... By the time I finish, I [Stammers]  I say, I probably getting up with you in like 4 hours, yo." Here, I believe that COLEY was telling CANADA to be ready in "4 hours" confirming what they had spoken about in session 472. Then in session 522 also on April 1, 2024 and several hours after session 474, COLEY sent CANADA a text message that read, "My brother just hit me so you already" which I believe was COLEY telling CANADA that his source was ready with a quantity of drugs for CANADA. In session 528, COLEY made a call to CANADA. The following was an excerpt from the intercepted communication:

> COLEY:        Bro-bro.
>
> CANADA:     Yo.
>
> COLEY:        Bro-bro.
>
> CANADA:     I heard you.
>
> COLEY:        Say that again?
>
> CANADA:     Said I heard you.
>
> COLEY:        You heard me on [PH]-
>
> CANADA:     Yeah. I heard you. I'll hit you soon.
>
> COLEY:        A'right.

91.     In this short and cryptic conversation that occurred several hours after session 474, I believe that COLEY was letting CANADA know the product was ready as immediately following this intercepted communication, investigators conducting both electronic and physical surveillance observed CANADA travel from Stamford to COLEY's residence **(Subject Premises Six)** in Bridgeport. Based on the above intercepted communications and the surveillance, I believe

CANADA's travel to **Subject Premises Six** was in furtherance of the conspiracy. CANADA remained at **Subject Premises Six** for approximately 20 minutes and then immediately traveled back to his residence (**Subject Premises One**) in Stamford.

92.     In session 653, the following day on April 2, 2024, COLEY sent CANADA a text message in session 653 that read, "The best number is 17" followed in session 656, "Im with him now" which CANADA responded in session 654, "Good looking family." I believe that when COLEY texted, "The best number is 17" that "17" represented the price for a quantity of drugs and that he was with the source ("Im with him now") at the time of the intercepted communication.

93.     In session 1234 on April 5, 2024, CANADA made an outgoing telephone call to COLEY. The following was an excerpt from the intercepted communication:

> CANADA:     Hey family, what's good ?
>
> COLEY:      What's up with you?
>
> CANADA:     Ain't shit. Hey, you remember when we... you talked to me about that thing before?
>
> COLEY:      Yeah, yeah!
>
> CANADA:     The two (2) for one (1) [ph]. I want those.

94.     I believe that when CANADA stated, "[t]he two (2) for one (1) [ph]. I want those" that he was discussing receiving a quantity of drugs in which CANADA would receive two, but would only have to pay for one upon receiving the drugs. In my training, experience and knowledge of this investigation, I know it is common for drug traffickers to receive kilogram quantities of cocaine on consignment and pay for a portion or all of the cocaine after the cocaine was sold.  The conversation continued:

| COLEY: | [Chuckles] that nigga ain't get back at me for that. I would've been holla at you. |
|---|---|
| CANADA: | I already know the nigga was bullshit man. |
| COLEY: | Nah! he wasn't bullshit nigga. Man, listen, I would have never even said nothing to you if I knew it wasn't official. That shit was official. The nigga just... I don't know where the nigga... the dude that is doing it; that nigga is not even around. You know what I'm saying. That nigga not around. |

95.     I believe that when COLEY stated, "Nah! he wasn't bullshit nigga. Man, listen, I would have never even said nothing to you if I knew it wasn't official. That shit was official. The nigga just... I don't know where the nigga... the dude that is doing it; that nigga is not even around" that COLEY was telling CANADA the source for the two kilograms was legit but the unidentified male that actually has the kilograms was not around at the moment. The conversation continued:

| CANADA: | Okay, okay, okay, okay. |
|---|---|
| COLEY: | That nigga got a rack of 'em ... that's why he doing it like that. He got a whole bunch of shit. That's why he able to do that. [Voices Overlap] |
| CANADA: | A'ight yeah. |
| COLEY: | Why what's going on? huh. |
| CANADA: | No you know, I just need 'em. Just to have them. |
| COLEY: | Oh! oh, a'ight, a'ight. Oh yeah, yeah, yeah. If my nigga come back around though, cause I know who it is. I know who it is. [Voices Overlap] |
| CANADA: | A'ight. |
| COLEY: | But I ain't... I ain't... he ain't gonna know, that shit is even for me. I'm going through somebody else. They... he gonna think.. [Voices Overlap] |
| CANADA: | That's a fact, yo. [Voices Overlap] |

| COLEY: | Yeah. |
|---|---|
| CANADA: | I don't care how you do it. You know what I'm saying. |
| COLEY: | Yeah, yeah, yeah. That nigga know who... that nigga... I know who the person is though. But when that nigga come back around, I got you. |
| CANADA: | Alright say less. |
| COLEY: | A'ight. |
| CANADA: | A'ight baby boy. |
| COLEY: | A'ight. |

96.    I believe when COLEY stated, "[t]hat nigga got a rack of 'em ... that's why he doing it like that. He got a whole bunch of shit. That's why he able to do that," COLEY was telling CANADA that the source for the drugs has "a rack of 'em," "[h]e got a whole bunch of shit" —in other words, that the source had multiple kilograms of cocaine which was how the unidentified source could be "able to do that" which I believe was a reference to the "two (2) for one." Based on this and other communications, I have probable cause to believe and do believe that COLEY was mainly dealing and brokering transactions involving cocaine.

97. On April 8, 2024 in session 1664, CANADA received an incoming telephone call from COLEY. The following was an excerpt from the intercepted communication:

| COLEY: | Hey listen [Chuckles] hey yo. [Voices Overlap] |
|---|---|
| CANADA: | Talk to me. |
| COLEY: | When the next time.. um you be cutting your hair or you go get your hair cut? |
| CANADA: | I get my hair cut, sometimes I cut my own shit. |
| COLEY: | A'ight listen, next time we get a hair.. next time you need a hair cut, I'ma take you to a barbershop on 116. You wanna know why? |

CANADA:      Uh huh.

COLEY:       Because that's the... you know.

CANADA:      I already know.

COLEY:       That's where is gonna go down so, I'ma, and the dude that cut, you'll love [ph] this nigga. This nigga ill [ph] with a Spanish nigga.

98.     I believe that COLEY wanted to take CANADA to a barbershop on "116" which I believe is 116th St. in Manhattan because that is "where is gonna go down." In other words, I believe he was saying that was where CANADA was getting supplied with a quantity of drugs. The conversation continued:

CANADA:      Oh yeah!

COLEY:       Yeah! Spanish nigga. Nigga cut like a motherfucker yo; and he cheap. I... I just give him 22 dollars for a line; that shit last for like a week.

CANADA:      Ah shit! Yeah, I'ma had that nigga. I got... I need that nigga to do me right man.

COLEY:       Yeah! so that's... that's where the nigga... my nigga said, that's where we wanna be hooking up at, anyways.

CANADA:      A'ight, say less brother.

99.     I believe when COLEY stated, "that's where the nigga... my nigga said, that's where we wanna be hooking up at, anyways" that COLEY was again telling CANADA that the "barbershop on 116" was where the drug transaction would take place to which CANADA used his oft repeated phrase of "say less" to minimize the conspiratorial conversation over the telephone.

100.    Later, on April 8, 2024, in session 1823, CANADA made an outgoing telephone call to COLEY, who based on an intercepted communication with CANADA in session 1821, was

on a train into New York City. In session 1823, CANADA asked COLEY, "You around anybody?" to which COLEY replied "nah." CANADA then told COLEY, "WhatsApp me." In this call, I believe that CANADA was asking COLEY to call him via WhatsApp (an end-to-end encrypted application) in order to thwart law enforcement detection.

101.    In session 2577 on April 13, 2024, CANADA received an incoming telephone call from COLEY. The following was an excerpt of the intercepted communication:

CANADA:     What's going on bro-bro?

COLEY:      Text me if you can. I'm in an old school bumpies.

CANADA:     Damn!

COLEY:      Yo.

CANDA:      Damn!

COLEY:      Yo! You know I am going to call you anytime I hear some weird shit.

CANADA:     Yeah.

COLEY:      [Sniffles] You know that fool that had bond [PH] with my nephew right?

CANADA:     Which one?

COLEY:      O-Diz (Possible reference to Omar PARRA).

CANADA:     Okay.

COLEY:      You know Fat Platt?

CANADA:     Mm-hm.

COLEY:      That's where that nigga was getting his work from, too.

CANADA:     Oh, word?

102.    I believe that when COLEY stated, "You know I am going to call you anytime I hear some weird shit," COLEY was letting CANADA know that he would call him if there was any possibility that CANADA was being targeted by law enforcement. Further, I know that "O-Diz" is an alias for Omar PARRA who was arrested in the District of Connecticut on or about March 19, 2024 on drug trafficking charges as indicated above (*See* 23mj230(SDV)) and that "Fat Platt" was an alias for a subject in Stamford identified as Mickey FRED who used to be a source of supply for PARRA, which COLEY discussed when he stated, "That's where that nigga was getting his work from, too." The conversation continued:

| | |
|---|---|
| COLEY: | Mm-hm. |
| CANADA: | Okay. [Voices Overlap] |
| COLEY: | The police got Fat Platt car right now. |
| CANADA: | Huh? |
| COLEY: | The police got Fat Platt car right now. |
| CANADA: | How? |
| COLEY: | Huh? |
| CANADA: | Where he got his car at? |
| COLEY: | Stamford. |
| CANADA: | What, they pulled him over just now? |
| COLEY: | A couple of days ago. Took his shit. He won''t go and get it, though. |
| CANADA: | Why they take it? |
| COLEY: | Man, I don't even know. I don't fuck with Fat Platt. I don't even know him like that, but I don't fuck with him. I heard some bad shit about him. |

CANADA:    Yeah.

COLEY:     But the Feds... came... I remember I told you... they were gonna try to flip that nigga right

CANADA:    Yeah.

COLEY:     They told the nigga, you don't gotta, you know, [Chuckles] because, [Stammers] if he a convict- if he a convicted felon, right? And they went in his crib and find the hammer [PH]... they can turn that shit into a 924 case?

103.    I believe that when COLEY stated, "But the Feds... came... I remember I told you... they were gonna try to flip that nigga right" that COLEY was telling CANADA that "the feds" were trying to get PARRA to cooperate because "they went in his crib and find the hammer" and I believe a "hammer" is coded language for a gun. The conversation continued:

CANADA:    Say what again?

COLEY:     He a convicted felon.

CANADA:    Yeah.

COLEY:     In possession of a firearm.

CANADA:    Uh-huh.

COLEY:     Can they turn that into a 924 or no?

CANADA:    That's a 924.

COLEY:     It is, right?

CANADA:    But it depends what, what letter. Now, [Stammers] if the drugs and guns was found together, then yeah, that's a 924-C.

COLEY:     Yeah, yeah, yeah. The drugs and the gun was found together.

CANADA:    Yeah, nah... they could try to hit him with a 924-C.

COLEY:     Mm... [Stammers] so the low for that is like 15.

CANADA:    No. Like 7.

COLEY:     You serious?

CANADA:    Mm-hm.

COLEY:     Oh, he ain't really... [UI]. 'Cause I don't really be liking talk, talking to him about that nigga on that phone...

CANADA:    Yeah.

COLEY:     But... I told him, I said 'Yo tell that faggot...' [Laughs] I ain't call him a faggot. I ain't call him no faggot. I said... the nigga trying to get... he got a escape case before, some shit like that. And I think that shit kind of um... got his points high. I don't know, I don't know, but he got, he, he had... he wanna get Phillip Russell [PH]... to fight that shit or something, right? So I told the nigga, I said "Tell that nigga... to get a lawyer... a couple of thousand dollars. Don't go get Phillip Russell 'cause he ain't suing nobody. That's all he good for."

CANADA:    Mm-hm.

COLEY:     Said 'Go get a lawyer, and have your oldest cases vacated. Before this, you know...because they won't be able to use them.'

CANADA:    Mm-hm. That's a fact.

COLEY:          They won't be able to use them, and that takes some points off your ass... and you won't have to be sitting there thinking about if you should roll over on a motherfucker.

104.     This conversation indicates both individuals' familiarity with federal charges including charges under 18 U.S.C. § 924(c) for possessing a firearm in furtherance of drug dealing. I believe COLEY was in contact with someone who was in contact with PARRA in jail and passed the message to PARRA, "Go get a lawyer, and have your oldest cases vacated. Before this, you know...because they won't be able to use them." COLEY wanted PARRA to do that because, "that takes some points off your ass... and you won't have to be sitting there thinking about if you should roll over on a motherfucker."  In other words, COLEY was emphasizing that PARRA should not be cooperating. The conversation continued:

CANADA:         Shit, I hope he don't.

COLEY:          That's all... nah, he ain't gonna do it. I don't believe he gonna do it. I don't, 'cause the nigga... I don't think he gonna do that. I don't think a lot of motherfuckers gonna do it but they do it. You know.

                [Voices Overlap]

CANADA:         So, so the Feds picked his shit up?

COLEY:          Yeah, I told you they picked it up. But they wasn't investigating them. They wasn't investigating them. The motherfucking state gave that shit to the Feds.

CANADA:         Yeah.

COLEY:      It wasn't inves- if that nig- Listen... if he was to get investigated by Feds, niggas would know. Trust me. Especially Fife [PH]. He wasn't doing no cruise [PH] right now.

105.    I know that "Fife" is an alias for Fidel SOTO who is a drug associate of PARRA and who PARRA refers to as his "brother". The conversation continued:

CANADA:     Mm. Mm. Mm.

COLEY:      That's why Fife was so scared. But I told him, I was like 'Yo, the Feds... was not investigating him.' They went to the crib at 11:00 something. They ain't get no warrant until damn near 3:00 o'clock in the morning?

CANADA:     Mm. Mm. Mm.

COLEY:      So they violated... that's a violation right there. Which they ain't gonna, you know. They got the nigga dead to the right, though, so they ain't got to worry about the shit they did wrong.

CANADA:     Yeah.

COLEY:      You know what I'm saying? They, they just know they gonna get a conviction. That nigga ain't going to trial. And that's only way he need a lawyer is if he go to trial. I was like 'Yo, if you get a lawyer for like, you wasting your money, homie.' I don't think he know that, though, because he don't know nothing about that system. [Pause] But yeah, man. They told the nigga...Oh, they told the nigga... They tryna flip him. So... they told the nigga, you... You know what I'm saying? 'You think about, you think about what it

62

is... the time that you about to spend away from your family,' he said 'but remember this... a lot... you about to have a lot of company. From Stamford.'

CANADA:   Like that's what he said?

COLEY:   That's what he told my nephew. That's what, um, O-Diz [PH] told my nephew, yo. So I said I gotta make sure I tell my nigga to keep his eyes open. And keep [Voices Overlap]

CANADA:   That's a fact.

106.   I believe that when COLEY repeated what the "Feds" told PARRA that "but remember this... a lot... you about to have a lot of company. From Stamford," that the main purpose of this intercepted communication was COLEY warning CANADA, who was the head of the DTO, to heed PARRA's warning about Stamford and the people who knew him within it. The conversation continued:

COLEY:   And keep these motherfucking snakes from around you, my nigga.

CANADA:   That's a fact, bro.

COLEY:   Every time you do good, 'Preme, every time you came home and start doing good, they- you got locked up, my nigga.

107.   I believe when COLEY stated, "Preme, every time you came home and start doing good, they- you got locked up, my nigga" that he was again warning CANADA to be careful of being targeted by law enforcement. The conversation continued:

CANADA:   Where you at? We, we gon' talk. Where you at?

COLEY:   I'm in the 'Port.

CANADA:   Oh, a'ight.

63

COLEY:      Yeah, every time you came home and got to it, niggas got you out of it! [Voices Overlap]

CANADA:     Hey! Yeah... We... I, I'll speak to you, bro-bro. Yeah, them niggas is crazy. A'ight? I'll holla at you la- I'mma holla at you in a little while.

COLEY:      Oh, you coming up here?

CANADA:     I don't know. I might.

COLEY:      Shit. [Clears Throat] Me too, I'm getting my clothes washed right now. Other than that, man, just keep your eyes open around this motherfucker, man, because... [Voices Overlap]

CANADA:     That's a fact. That's a fact, that's a fact.

COLEY:      Niggas ain't got time for the, for the dumb shit, like... You know what I'm saying?

CANADA:     That's a fact. [Voices Overlap]

COLEY:      [Audio Distortion] my nigga. I'm never like... I can't stand Stamford when it come to that type of shit, like... It ain't nothing to do with Stamford. Niggas is riding around... niggas is just doing the same old shit, [UI] rats, just running shit. They weak.

CANADA:     Mm-hm.

COLEY:      [Audio Distortion] power. [UI] [Audio Distortion] this motherfucker. And it ain't good, man, to be... You know what I'm saying? It's not, it's just not a good thing. It's not a good thing.

64

|  | Stamford is a fucked up town, man. When it come to tryna... just get some bread. Like, Stamford ain't, Stamford ain't it, man. |
|---|---|

CANADA: No, it ain''t.

COLEY: That shit been going, that shit been fucked up for years, thought, like that.

CANADA: That's a fact, brody.

COLEY: And it's gonna get worse, my nigga.

CANADA: Hm. You coming down this way? [Stammers] You on your way down here?

COLEY: Yeah, I'm coming down there. I'm coming down there.

CANADA: A'right, hit me when you get down here.

COLEY: A'ight, I got you.

CANADA: A'right.

COLEY: A'ight, one.

108.    I believe COLEY is a member of the conspiracy, who based on the intercepted communications, primarily brokers drug transactions for the CANADA DTO. Throughout this call, COLEY was repeatedly warning CANADA not to cooperate and not to talk with law enforcement including his final warning, "Other than that, man, just keep your eyes open around this motherfucker, man, because..." **As a result of these calls and other similar ones throughout the course of the investigation as well as surveillance and other information, I have probable cause to believe and do believe that COLEY conspired with others in this DTO to possess with intent to distribute and to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.**

**Pertinent Communications with DOZIER**

109.    Wire and electronic communications intercepted over Target Telephone 4 also revealed a drug trafficking relationship between CANADA and Benjamin DOZIER who was using telephone number (475) 201-8597. This number has been tied to DOZIER through intercepted calls and surveillance. Despite a limited number of intercepted communications with DOZIER, based on the intercepted communications and physical surveillance, and as will be detailed below there is probable cause to believe that DOZIER is a fentanyl source of supply for the CANADA DTO.

110.    On March 7, 2024, investigators conducted a "wall off" stop in Stamford of a customer of the CANADA DTO identified as Timothy SHANTZ and seized two knotted plastic bags containing cocaine and 11 bags of fentanyl from SHANTZ. The bags were stamped with the label "Blackjack". Post-arrest, SHANTZ was *Mirandized* and made statements indicating that he had ordered a bundle of fentanyl and two $50 bags of cocaine from CANADA who gave an extra bag of fentanyl to SHANTZ equaling the 11 bags seizure from him. SHANTZ told Stamford Police that he had been ordering drugs from CANADA for approximately 45 days and estimated that he had spent approximately $5,000 to purchase primarily fentanyl and cocaine from CANADA over the course of the last thirty days. SHANTZ was subsequently released following his arrest.

111.    Prior to March 15, 2024, there was intercepted communication that indicated that CANADA needed to be resupplied with fentanyl. For example, in session 2956 on March 13, 2024, CANADA made an outgoing call to SHANTZ and told SHANTZ, "I didn't grab yet. I'm 'bout to grab it today, though" to which SHANTZ responded, "Nah, nah, I need soft". I believe

CANADA was telling SHANTZ that he needed a re-supply of fentanyl when he said "I'm 'bout to grab it today" to which SHANTZ replied, "I need soft" or cocaine.

112.    Then during the morning of March 15, 2024, investigators were conducting surveillance of CANADA and observed CANADA enter the parking lot attached to the McDonald's restaurant located at 1900 Fairfield Avenue Bridgeport, CT and back into a parking space. A few minutes later, investigators observed DOZIER, operating a black Lexus bearing Connecticut registration BK88319, enter the parking lot of the aforementioned McDonald's restaurant and park next to CANADA. The license plate on the car, CT registration BK88319, was registered to a 2015 black Lexus registered to DOZIER, 65 Houston Ter., Stamford, CT. Investigators then observed DOZIER exit the operator's seat of the Lexus and enter the front passenger seat of CANADA's Toyota rental that he was driving at that time.

113.    A few minutes later, investigators observed DOZIER exit CANADA's Toyota, and re-enter his Lexus. Both subjects departed separately from the parking lot.

114.    Prior to CANADA meeting with DOZIER, there were no intercepted communications that revealed CANADA's travel to Bridgeport. However, immediately following the meeting, in Session 3073, CANADA sent an outgoing text to SHANTZ that read, "Black Jack back." The dosage units of fentanyl seized from SHANTZ that had been supplied by CANADA were stamped "Blackjack" (which as described above, I know to be a stamp that CANADA distributed). I believe CANADA's meeting with DOZIER was to receive a quantity of fentanyl that was either already stamped or was going to be stamped with the "Blackjack" logo by CANADA or one of his co-conspirators. Additionally, in session 3074, CANADA sent the exact same message "Black Jack back" to another customer of the CANADA DTO identified as Christian MORALES and in session 3075, CANADA made an outgoing telephone call to another

customer identified as Edward WRIGHT and told WRIGHT, "Black Jack back." These additional intercepted communications reinforce my belief that CANADA met with DOZIER to receive a resupply of fentanyl from DOZIER.

115.    Then in session 1538 on April 7, 2024, CANADA made an outgoing telephone call to DOZIER. The following is an excerpt of the intercepted communication:

| | |
|---|---|
| CANADA: | So what's up, bro-bro? |
| DOZIER: | Shit. Um... I ain't doing much right now. I'm just... you know. |
| CANADA: | Come through. |
| DOZIER : | Yo. Bro, listen man, fucking, um... I got the Jack now too, I need, I need... this shit I did, bro, that shit ain't right, bro. |

116.    I believe when DOZIER stated that "I got the Jack" now too, this  was a reference that he had fentanyl stamped with Blackjack available. The conversation continued:

| | |
|---|---|
| CANADA: | Don't worry, we good. |
| DOZIER: | Yeah... I need, I need, um... I definitely need that. 'cause [Voices Overlap] |
| CANADA: | Yeah, we good. |
| DOZIER: | I went and... I went and seen somebody with um... with that thing I had did, bro and yeah... motherfucker cussed me out. And I don't wanna start off... you know, with the nigga joint like that and lose the motherfuckers before I even, you know what I'm saying? I got 'em locked in and shit. |
| CANADA: | Yeah, throw that shit out, bro, we good. |
| DOZIER: | A'ight. |
| CANADA: | A'ight? |
| UM: | A'ight.  Yeah. |
| CANADA: | You coming down? |

| DOZIER: | Yeah, where, um... when you want me to slide out that way? |
| CANADA: | You know where to. |
| DOZIER: | Huh? |
| CANADA: | Mom dukes [PH]. |
| DOZIER: | A'ight, I'mma um, come.... Nah, nah, nah, I know that part. I'm just saying, when you want me to come up there? |
| CANADA: | Anytime. |
| DOZIER: | A'ight. |
| CANADA: | Come now. |

117.    Following this intercepted communication, investigators conducting surveillance observed DOZIER arrive in his Lexus to CANADA's mother's apartment building at 352 Glenbrook Road Stamford, CT and park in the parking lot of the apartment building. Investigators then observed CANADA arrive in his Toyota rental and park next to DOZIER's car so that both driver's side windows were facing each other. Investigators then observed DOZIER enter the passenger side of CANADA's car and approximately 15 minutes later exit CANADA's vehicle, re-enter the Lexus and depart. Investigators surveilled DOZIER to 166 West Liberty Street, Bridgeport, CT, where he exited the car and entered the apartment building. DOZIER provided apartment 2 (**Subject Premises Seven in Bridgeport**) at that address to Connecticut Probation as his residence. **As a result of these calls and other similar ones throughout the course of the investigation as well as surveillance and other information, I have probable cause to believe and do believe that DOZIER conspired with others in this DTO to possess with intent to distribute and to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.**

**Pertinent Communications with TURKVAN**

118.    Wire and electronic communications intercepted over Target Telephone 4 also revealed a drug trafficking relationship between CANADA and Danny TURKVAN a.k.a. "Smooth" who was using telephone number assigned (203) 559-7789. This number has been tied to TURKVAN through recorded calls and surveillance. Based on the intercepted communications and physical surveillance, and as will be detailed below, there is probable cause to believe that TURKVAN is a trusted member of the CANADA DTO and a re-seller of controlled substances distributed by the CANADA DTO. Similar to WILLS, TURKVAN and CANADA have an established drug relationship that required minimal communication. There was a number of intercepted communication in which CANADA and TURKVAN agree to meet. In session 697, on April 3, 2024, CANADA asked TURKVAN, "You at Pop's, right?" to which TURKVAN answered "Yeah" and CANADA responded, "Hurry up and let me into the bottom. I don't even feel like waiting, man. This shit hot, man. I feel like your brother's setting me up, man. Hurry up, open this gate, man. Please."

119.    As will be discussed below, CANADA and TURKVAN have subsequent intercepted communication discussing TURKVAN's brother Keith TURKVAN possibly cooperating with law enforcement—again in an indication of how the two were conscious of law enforcement detecting their illegal activity. I believe when CANADA stated, "This shit hot, man. I feel like your brother's setting me up, man. Hurry up, open this gate" that CANADA was visiting TURKVAN at "Pop's" or TURKVAN's father's residence with a quantity of drugs, otherwise, CANADA would not be concerned about "this shit hot" or feeling like "you brother's setting me up". Again on April 5, in session 1105, CANADA and TURKVAN discussed meeting at TURKVAN's father's residence without any additional context.

70

120.    There were also a number of communications intercepted that showed the two meeting up. For example, in session 2573, on April 13, 2024, TURKVAN sent CANADA a text, "Come by pops when u come out;" in session 3030; on April 15, 2024, TURKVAN sent CANADA a text message that read, "Hey Come check me gotta rap to u on spruce;" in session 3278 on April 16, 2024, CANADA asked TURKVAN, "Where you at?" to which TURKVAN replied, "On Spruce" which I know to be Spruce St. in Stamford. There was no additional context for any of these intercepted communications as to the purpose of these meeting, which I believe, based on my training and experience and what I have learned during this investigation, were drug related.

121.    During session 418 on March 30, 2024, CANADA received an incoming telephone call from TURKVAN. The following is an excerpt from the intercepted communication:

CANADA:     Smooth be chill.

TURKVAN:    What is you mad about now?

CANADA:     Oh, we gon' have to talk I'm, I'm [Voices Overlap]

TURKVAN:    [Laughs] What? No, no, no, no, no. Get out of here. 'Cause before I got there, what I said? I said Monday. Didn't I say that?

CANADA:     [UI] [Voices Overlap]

TURKVAN:    I said Monday. The other day I just thought 'cause me and Kizzo [ph] you know we doing something together. So he [Voices Overlap]

CANADA:     A'right but act- that's what I wanted to [Voices Overlap]

TURKVAN:    So he said, but he said he wanted to talk to you. He said he wanted to talk to you. [Voices Overlap]

CANADA:     And that's what I need to talk to you about, Smooth.

TURKVAN:    Why? What happened?

CANADA:     I heard some wild shit about Keys [ph], man.

TURKVAN:    Like what?

CANADA:     Like he was working with them.

122.    I "Kizzo" or a.k.a. "Keys" are known aliases for Keith TURKVAN, the brother of

Danny TURKVAN. Keith TURKVAN was arrested on February 20, 2024 by the Danbury Police

Department subsequent to the execution of a search warrant in Brookfield, CT and the seizure of

a quantity of fentanyl. I believe when CANADA stated, "Like he was working with them" that

he (CANADA) believed Keith TURKVAN was cooperating with the police following his arrest.

The conversation continued:

TURKVAN:    Working with who?

CANADA:     Did you know they raided... where you at?

TURKVAN:    Shit, I had to... I told you I'm at, you know I had to um, come down
            here and help Pumpkin [ph] out.  Um, I told her I'm driving her
            back up here in the morning.

CANADA:     Oh, oh, you up where?

TURKVAN:    I'm in North Carolina.

CANADA:     Oh, okay, okay, okay.

TURKVAN:    [Stammers] What happened?

CANADA:     You know they raided, you know they raided Keys spot on, in
            Brookfield. He live in Brookfield.

TURKVAN:    Yeah, he... that Tasha, Tasha joint.

123.    I know in speaking with members of the Danbury Police Department that the

search warrant was executed at the residence of Natasha PENNYWELL and that TURKVAN was

present at the residence during the time of the search.  The conversation continued:

CANADA:     They raided the spot like a month and a half ago. You know that?

TURKVAN:    Yeah, I do. Yeah.

CANADA:     A'right. Do you know she agreed to set motherfuckers up?

TURKVAN:    [Pause] What?

CANADA:     Listen to me, bro. She agreed to set motherfuckers up. And she admitted it. When they raided crib [UI] she agreed to, to work with 'em and set niggas up. She admitted it. This is what I'm hearing. This is all hearsay. But... it's some good sources. But this is hearsay.

TURKVAN:    When you heard this, Preme?

CANADA:     Um... I just heard it yesterday. So...

TURKVAN:    [Muffled Voice] Maybe that's what Steve gotta talk to me about, then.

CANADA:     So... yeah, so listen. So called... yeah, Big [UI], she called Name [ph]. And told Name everything. That she agreed to work and 'boom boom boom.' And... like a couple days ago, they say Keys went up there to see Name and tried to line him up.

TURKVAN:    What you mean line him up?

CANADA:     They say he had the undercovers there.

TURKVAN:    Nah. I ain't gon'... nah. Mm-mm.

CANADA:     Hey, I don't believe- the person, he told me, he said "Man... niggas don't know Keys." Keys is official, like... You know what I'm saying? [Voices Overlap]

TURKVAN:    Yeah, that's not... Not my brother. [Voices Overlap]

CANADA:     Yeah.

TURKVAN:    That bitch, I don't put nothing past Tasha.

CANADA:     Yeah.

TURKVAN:    My brother ain't gon' do no shit like that, man.

CANADA:       And that's what I'm saying. And I'm sitting there like... [Voices Overlap]

TURKVAN:      When it comes to that type of shit, that's a real nigga, man. He ain't gon'[Voices Overlap]

CANADA:       That's facts [PH], man. [Voices Overlap]

TURKVAN:      Now you got, now you got my voice all cracking right now. Who the fuck told you this, Preme? You said it's a reliable source? You [UI]? Before you done mention it to me, it gotta be a real nigga.

CANADA:       Yeah, it was a good source.

TURKVAN:      Oh my God.

CANADA:       It was a good source, man. That's why I said I went to talk to Keys for a s- you know... Sometimes you gotta check people temperatures, man. Some of the realest [UI] [Voices Overlap]

TURKVAN:      Looking, looking right now. You goddamn right.

CANADA:       Some of the realest have turned, bro. [Voices Overlap]

TURKVAN:      And when he start that stuttering shit... He start that stuttering and shit, you know he lying.

CANADA:       Mm-hm. And this is what they say. How do you, how do I know that they got raided a month and a half ago in Brookfield? I don't know nothing about where they live at, or...

TURKVAN:      Yup. They definitely did. And it took a minute for him to- he ain't tell me 'til like a week later.

CANADA:       You understand what I'm saying? [Voices Overlap]

TURKVAN:      I'ml like what happen, what you mean? What? He be like "Yeah, man, but... you know." I was like... 'Cause they was beefin' for me [ph]  that's when he came to the crib.

CANADA:       Mm, mm, mm. [Voices Overlap]

TURKVAN:      Oh this fucking bitch this and that and that and this. I'm like what? Only thing Steve, only thing Steve told me was... the nigga was talking about taking the charge [PH]. I'm like 'what you mean [UI], he talking about taking the charge [PH]?' Taking all the weight.

74

CANADA:      [Coughs]

TURKVAN:     And Steve is like 'man, watch out for that [UI], stop, don't fuck
             with that nigga, man. Leave that nigga alone.' But you know him
             and Steve already beefin', so I'm just thinking Steve mad at him.

124.    I believe "Steve" is a reference to Steve TURKVAN, another brother of Danny

TURKVAN. Later in the conversation the two continued in pertinent part:

CANADA:      Yeah, she said that. They say she said that. She called Name and
             specific told Name outta her mouth. Then when I asked you, I said
             "You, you double back here, you going to get shit from other...?" I
             be knowing shit. [Voices Overlap]

TURKVAN:     No but I don't fuck with Name. I haven't fucked with- listen, I
             haven't fucked with Name at all. [Voices Overlap]

CANADA:      I know, but Keys do.

TURKVAN:     Huh?

CANADA:      Keys do.

TURKVAN:     Yeah, Keys my brother do. Yeah. I don't fuck...

CANADA:      Yeah.

TURKVAN:     Listen, that nigga... Listen. This is before I even fucked with you. I
             got some Fentanyl from the nigga. He starter fuckin' [Stammers], I
             never got nothing from... That nigga be calling, yo why that nigga...
             why that nigga used to, that nigga blows me up. I don't, I don't...
             [UI] you know. Yeah, I show him respect [Stammers], that's Name,
             that's my boy. But I don't go [UI] [Voices Overlap]

125.    I believe when TURKVAN stated, "[t]his is before I even fucked with you. I got

some Fentanyl from the nigga,", TURKVAN was referring to receiving fentanyl from CANADA

but prior to receiving fentanyl from CANADA, TURKVAN was supplied fentanyl by the alias

"Name" who I believe is a Stamford dealer identified as Jonathan RUFFIN a.k.a. "Name." Then

in session 424, TURKVAN made a follow up telephone call to CANADA. The following is an excerpt of the intercepted communication:

> TURKVAN:   I just got off the phone with Steve.

126.   Again, I believe Steve is Steve TURKVAN, the brother of Danny TURKVAN.

The conversation continued:

> CANADA:   What Steve say?

> TURKVAN:   Everything you just said.

> CANADA:   For real?

> TURKVAN:   Yup. He said, um. He said Name told him this. He said Name told him this. But he said um... but he said I said. Like... you know, [UI] man. You know I don't think he'd, but... I don't know. Like Steve was talking 'Leave him alone, don't fuck with him.' I told him, you know, I told him, you know the deal with you and he was like 'tell Preme just leave him alone. Don't fuck with that nigga, man. Leave him alone. You gotta leave him alone too." That's what he told me.' You think, I think you tryna be sneaky, doing behind my back, dealing with him." I said "I wouldn't try and be..." I said "I know you don't deal with the nigga so I wasn't gonna tell you what's going on with me and him." You know what I mean?

> CANADA:   Yeah.

> TURKVAN:   'Like man, leave that nigga alone, I been trying to tell you, leave him alone. Just leave him alone, man.'

> CANADA:   Word, man. Leave him alone.

> TURKVAN:   '[Stammers] I know he's your brother, he's just [UI], love him too. But he ain't, the nigga bugged out. He ain't... You know what I mean?" He said "I ain't saying him, but Tasha [UI]...' He said Tasha... period. 'Cause Steve was giving her work still. He just stopped fucking with her. Period. All this time he was giving her work. And she doing that shit behind [UI] back.

127.   I believe that following session 418, TURKVAN contacted his brother, Steve TURKVAN and corroborated CANADA's information about the arrest of Keith TURKVAN

when Danny TURKVAN stated, "Everything you just said" in response to CANADA asking "What Steve say?" Danny TURKVAN then repeated Steve TURKVAN's warning to CANADA "tell Preme just leave him alone. Don't fuck with that nigga, man. Leave him alone. You gotta leave him alone too." This was regarding CANADA supplying drugs to Keith TURKVAN. I know that CANADA has a drug trafficking relationship with Keith TURKVAN based on intercepted calls and other information learned throughout the course of this investigation.

128.    In session 570 on April 2, 2024, CANADA received an incoming telephone call from TURKVAN. The following is an excerpt of the intercepted communication:

TURKVAN:    Did you talked to him.  Did you talked to him, gang?

CANADA:    No I didn't, man.  I gotta stay  and wait for him.

TURKVAN:    That's all.  That's why I said that.  Just do it. That's all.  Just do that.

CANADA:    Yeah! I ain't even trying... I ain't even.. [Voices Overlap]

TURKVAN:    [U/I] even doing all that other shit... just stay on... you know what I mean.

CANADA:    Yeah! I ain't even trying to get that money from him.  I'm ... let him keep that.

129.    I believe that when CANADA stated, "ain't even trying to get that money from him" that Keith TURKVAN owed CANADA drug proceeds, but CANADA did not want to collect it as CANADA was staying away from Keith TURKVAN for fear he was cooperating with law enforcement. The conversation continued:

TURKVAN:    [Chuckles]

CANADA:    I swear bro.'  I'm just hoping I ain't got no sale [ph] charges from your brother man.

TURKVAN:     Nah! I don't think so.  You know... I don't think you gotta worry about him. But I think, like, say, you know? is Tash.  Is Tash. I know is her. You know what I mean?

CANADA:      Damn man!

130.     I believe when Danny TURKVAN stated, "I don't think you gotta worry about him. But I think, like, say, you know? is Tash."  In this conversation, I think that Danny TURKVAN was telling CANADA to be more concerned about "Tash" who I believe is Natasha PENNYWELL cooperating with law enforcement. Later in the conversation they continud:

TURKVAN:     But imma hit you up in  a little bit, my nigga.  And uh... I'll be good.

CANADA:      Alright, hit me.

TURKVAN:     i don't know, I don't know, I don't think imma have no extra though.

CANADA:      [U/I] [Voice Overlap]

TURKVAN:     Need you to do what I want you to do. I would ask a lot of little nice little love some today, with my, with my pay

131.     I believe when TURKVAN stated, "I don't think imma have no extra though" that he was telling CANADA that he did not have the complete amount of drug proceeds owed to CANADA. Further when TURKVAN stated, "Need you to do what I want you to do. I would ask a lot of little nice little love some today, with my, with my pay" that TURKVAN was asking CANADA to give him some extra time or "little love" in paying his drug debt owed to CANADA. The conversation continued:

CANADA:      Hey, in about a day you would of still been with [stammers] I would have still been out a point [Voice Overlap]

TURKVAN:     [U/I] I said the first my nigga. If I would [U/I] it would have been yesterday, but I guarantee it would of, I'm telling you, my nigga, I

78

[U/I] I'm telling you, I would have been straight. You would have been straight. I got you though regardless, I'm just saying, I wanted to, I wanted to get that, you're allowed to [U/I] my nigga. I wanna get the bill off you, um Preme.

CANADA:   When you come back I got you now.

TURKVAN:   Yeah, I wanna, I wan- yeah my nigga, I, I, yeah, listen, just look at it like this Preme, yeah I'm taking an extra two days, three, or whatever, but Preme, you get, you getting two payments though my nigga, you know what I'm saying [Voice Overlap]

CANADA:   I get what you [Voice Overlap]

TURKVAN:   Yeah you know I ain't no jerk, you [U/I] nigga like, I'm, I'm, yeah I might take a little longer, but I'm trying to come off [U/I] and pay you my nigga. I gotta get this shit out the way my nigga.

CANADA:   Alright, I got you.

TURKVAN:   You know what I'm saying? Word. Ill see you in a little bit though, I'll see you in a little bit, um [U/I] imma see you in a little bit.

CANADA:   Alright.

TURKVAN:   I'm rippin and running right now. Yeah I'm rippin and running right now.

CANADA:   Alright.

TURKVAN:   Alright man.

132.   I believe when CANADA stated, "I would have still been out a point," I know "a point" is common drug vernacular for a small profit, usually $1,000 on the sale of wholesale quantities of drug.  TURKVAN then told CANADA, "I said the first my nigga. If I would [U/I] it would have been yesterday, but I guarantee it would of, I'm telling you, my nigga, I [U/I] I'm telling you, I would have been straight. You would have been straight. I got you though

regardless." In this conversation, I believe that TURKVAN was reassuring CANADA that he would pay his debt when he said "I got you." TURKVAN continued "Yeah, I wanna, I wan- yeah my nigga, I, I, yeah, listen, just look at it like this Preme, yeah I'm taking an extra two days, three, or whatever, but Preme, you get, you getting two payments though my nigga, you know what I'm saying," which I believe TURKVAN was telling CANADA, that CANADA would be receiving "two payments" from TURKVAN in order to pay off his drug debt. I also believe when TURKVAN repeated "Ill see you in a little bit" that he was reassuring CANADA in code language that he would be seeing CANADA in order to pay CANADA the drug debt because TURKVAN was "rippin and running right now" which I know is common drug vernacular for quickly selling drugs.

133.    In session 1679, on April 8, 2024, CANADA received an incoming telephone call from TURKVAN. During the conversation, CANADA and TURKVAN discuss Keith TURKVAN being arrested in Southbury, CT with a gun. TURKVAN stated, "This nigga in jail with a gun charge" to which CANADA responded, "who?" "Keith" and TURKVAN responded in the affirmative. TURKVAN then told CANADA, "You know I ain't play ... you know I ain't gonna play about no shit like that. Nigga came to the crib Saturday night. He came to the crib Saturday night, grab somethin' [U/I] he grab the gun. I didn't even know he grabbed the gun. He got stopped up in Southbury." In this portion of the conversation, I believe Danny TURKVAN was telling CANADA that Keith TURKVAN had stopped by his house or "crib" and "he grab[bed] the gun" which I believe Danny TURKVAN, who is a convicted felon, was telling CANADA that the gun had come from Danny TURKVAN's "crib."

134.    In session 3531 on April 18, 2024, CANADA made an outgoing telephone call to TURKVAN and during the intercepted communication, CANADA told TURKVAN, "I might

need to see you today man. I gotta handle something." In this call, I believe that CANADA needed to meet with TURKVAN before he had to "handle something" which I believe, based on CANADA being the head of the DTO and TURKVAN a member of the conspiracy, was CANADA's plans to obtain a quantity of drugs. This belief is further reinforced as the conversation continued:

TURKVAN:   Shit I was gonna do that [ph] tomorrow. I was gonna call, yeah. I see you tomorrow, early .

CANADA:   A'ight, yeah. That'll be good early. A'right.

TURKVAN:   You know how I do Friday and Saturday.

CANADA:   I got you. I'ma need to see you early cause I gotta go make some moves.

TURKVAN:   A'ight. No doubt.

CANADA:   If you could. If you could. I ain't rushing.

135.   I believe when CANADA stated, "I got you. I'ma need to see you early cause I gotta go make some moves" that CANADA needed to see TURKVAN early the next day, which I believe was to receive a quantity of drug proceeds from TURKVAN prior to CANADA having to "make some moves" which I believe was coded language to obtaining a quantity of drugs. TURKVAN answered in the affirmative and CANADA then stated, "If you could. If you could. I ain't rushing," which again I believe CANADA was telling TURKVAN that he "ain't rushing" TURKVAN to pay him the drug proceeds.

136.    On April 22, 2024, in session 4153, CANADA received an incoming telephone call from TURKVAN. During the intercepted communication, TURKVAN stated, "Yeah, I was going to finish working out. I just.. .I gotta wait till these fellas doing their shit. But I was going to hit you up today, anyway, yo. Uh, uh... Let me just drop a little more, little more bread. I'ma get this money from Steve, too. you know. He left it in Waterbury, I never made it back up here, though. So, I'm uh... he gonna grab that shit and then come down. So [U/I] you know, brown game time. I hit you up." I believe that TURKVAN was going to drop a quantity of drug proceeds to CANADA when he stated, "Let me just drop a little more, little more bread. I'ma get this money from Steve". CANADA replied with his signature, "Alright. Say less though." TURKVAN then asked CANADA "where you at?" to which CANADA replied, "Shit, I'm on the East side. About to... I gotta go grab some things right now." With this answer, I believe CANADA was indicating that he wasabout to "grab" a quantity of drugs or "some things,"

137.    **As a result of these calls and other similar ones throughout the course of the investigation as well as surveillance and other information, I have probable cause to believe and do believe that TURKVAN conspired with others in this DTO to possess with intent to distribute and to distribute heroin, fentanyl, cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846.**

## Pertinent Communications with Jimmy ARCE

138.    Despite not being intercepted on the CANADA Telephones, physical surveillance and electronic surveillance has identified a drug trafficking relationship between CANADA and Jimmy ARCE ("ARCE") a.k.a. "Boe," a.k.a. "Slim," a.k.a. "Jimbo." As will be detailed below, ARCE is a fentanyl and cocaine source of supply. Surveillance during the periods of interception identified CANADA meeting with ARCE on March 5, 2024 and April 3,

2024 at a restaurant owned by ARCE called Papi's Pinchos and Grill, located at 1653 Barnum Avenue, Bridgeport, CT. Based on my training and experience and other information learned throughout the course of this investigation, I believe that those meetings were drug related.

139.    Despite a lack of intercepted communications with ARCE, probable cause exists to believe that ARCE is involved in a separate drug conspiracy, to include Omar PARRA, charged separately, in which he was the source of supply for fentanyl that was supplied to an undercover officer (UC-1) and that he further supplied PARRA throughout the course of the conspiracy.

140.    Starting in January 2023, investigators utilized cooperating witness CW-2 to conduct controlled purchases of fentanyl from Stamford trafficker Omar PARRA. CW-2 has been cooperating with the Federal Bureau of Investigation (FBI) New Haven Transnational Organized Crime Task Force (TOC-TF) since July 2016. CW-2 has provided information which has been corroborated and has been proven reliable.  CW-2 has convictions for: (a) possession of hallucinogens/ marijuana with intent to distribute; (c) assault; (d) violation of probation; (e) larceny; and (f) disorderly conduct.  CW-2 has indicated that he is willing to testify and is cooperating for sentencing consideration.  CW-2 has conducted proactive operations under law enforcement direction and supervision.  Those operations have included consensual recordings and the provision of details of CW-2's observations to the law enforcement officers.  During all controlled meetings referenced herein, CW-2 was searched before and after each controlled meeting for the presence of narcotics with negative results.

141.    After a prior successful controlled buy, not relevant here, on February 22, 2023, investigators met with CW-2 in order to conduct a controlled purchase of 100 grams of loose or raw fentanyl from PARRA. Unlike fentanyl that is bundled, loose or raw fentanyl is fentanyl

that is not pre-packaged for individual dosage units. CW-2 was outfitted with a "kel" transmitter recording device. CW-2 was again provided with a quantity of buy money. CW-2 and CW-2's vehicle were searched for contraband with negative results. At the direction of investigators, CW-2 contacted PARRA on telephone number (203) 638-4681. PARRA directed CW-2 to meet on Parker Avenue in Stamford, which was a short walk from PARRA's residence on Center Street.

142.    Prior to the meeting, investigators had established surveillance in the vicinity of PARRA's 50 Center Street residence investigators and observed a Nissan Altima bearing Georgia Dealer Registration XYP500 registered to AUCTION DIRECT LLC., 1220 Franklin Gtwy., Ste 260, Marietta, GA 30067 arrive at PARRA's residence. ARCE had previously been observed driving that vehicle and is the owner of AUCTION DIRECT LLC., a Georgia based used car business. Investigators observed PARRA talk with the driver of the Nissan Altima and retrieve an unknown item from the car. Though ARCE had been previously observed driving the Nissan Altima, investigators could not get a view of the driver to confirm ARCE was driving the vehicle that day. Investigators then observed PARRA enter into a Toyota Camry that was parked at 50 Center St. parking area. The Toyota was registered as a rental vehicle and PARRA drove the Toyota to meet with CW-2 on Parker Ave. Following the meeting, PARRA was surveilled back to his residence driving the Toyota rental.

143.    CW-2 was surveilled back to a pre-determined meet location following the meeting. Investigators recovered a clear plastic bag containing an off-white powdery substance from CW-1 of suspected fentanyl that was submitted to the DEA laboratory in New York City and confirmed by the DEA lab to contain a detectable amount of fentanyl with a net weight of approximately 98.8 grams.

144.    Investigators recovered the kel transmitter and CW-2 and CW-2's vehicle were searched for contraband following the controlled meeting with negative results.

145.    In March 2024, investigators conducted a proffer session with a cooperating defendant (CD-1) who had been arrested on drug charges in the District of Connecticut and who was being held in custody on state drug charges. CD-1 provided information to investigators at the proffer session that was corroborated and deemed truthful. CD-1 admitted that he had participated in the February 22, 2023 fentanyl transaction and that ARCE was the driver of the Nissan Altima and had delivered the fentanyl to PARRA on February 22, 2023 that PARRA had provided the fentanyl to CW-2.

146.    On March 28, 2023, investigators conducted another controlled purchase of 100 grams of fentanyl from PARRA. Investigators utilized a second confidential witness (CW-3) who was introduced to PARRA as an associate of CW-2 to conduct the controlled purchase from PARRA. CW-3 had been cooperating with the Drug Enforcement Agency-Bridgeport Resident Office (BRO) since 2019. CW-3 originally began cooperating with law enforcement in the hopes of receiving charging consideration related to a drug investigation. CW-3 ultimately was not charged in connection with that investigation. CW-3 was cooperating with law enforcement in exchange for monetary compensation. CW-3 has a prior criminal history that includes convictions for a misdemeanor drug charge and breaching the peace. Information provided by CW-3 has led to the seizure of drugs and arrests of individuals on drug charges. Information provided by CW-3 is believed to be reliable. Those operations have included consensual recordings and the provision of details of CW-3's observations to the law enforcement officers. During all controlled meetings referenced herein, CW-3 was searched before and after each controlled meeting for the presence of narcotics with negative results.

CW-3 was deactivated as a confidential source in May 2023 after it was learned that unbeknownst to investigators, CW-3 met with a target of an unrelated investigation and collected a quantity of drug proceeds from the target. CW-3 admitted to the meeting when confronted by investigators and was ultimately deactivated as a confidential source as a result of the unreported activity.

147.    CW-3 was outfitted with a "kel" transmitter recording device. CW-3 was again provided with a quantity of buy money. The serial numbers of the buy money were recorded prior to the meeting. CW-3 and CW-3's vehicle were searched for contraband with negative results. At the direction of investigators, at approximately 12:35 pm, CW-3 placed a consensually monitored and recorded telephone call to PARRA who was using telephone number (475) 746-1581 and again confirmed the location of Parker Avenue for the meeting.

148.    Again, investigators observed ARCE's Nissan Altima from the prior deal arrive at PARRA's residence prior to the controlled meeting and confirmed ARCE was the driver. Investigators observed the Nissan Altima driven by ARCE exit the driveway of 50 Center Street, pull onto Parker Avenue and park directly behind CW-3's vehicle, which had arrived on Parker Ave. Investigators observed PARRA exit the front passenger seat of the Nissan Altima and enter into CW-3's vehicle. ARCE then drove the Nissan Altima to a nearby parking lot.

149.    Following the meeting with CW-3, PARRA was observed exiting CW-3's vehicle and walking to the Nissan Altima. Investigators surveilled PARRA and ARCE back to PARRA's residence at 50 Center Street in Stamford.

150.    Following the meeting, investigators met with CW-3 back at the neutral location and recovered approximately 100 grams of the suspected fentanyl. Investigators submitted the suspected fentanyl to the DEA laboratory in New York City and forensic analysis conducted by

the lab confirmed a detectable amount of fentanyl in the exhibit with a net weight of 99.9 grams. Investigators recovered the kel transmitter from CW-3 and CW-3 and CW-3's vehicle were searched for contraband following the controlled meeting with negative results. CD-1, who participated in the March 28, 2023 fentanyl transaction, said that ARCE was the driver of the Nissan Altima and had delivered the fentanyl to PARRA on March 28, 2023 that PARRA had subsequently provided to CW-3.

151.    On May 19, 2023, investigators utilized a police officer ("UC-1"), acting in an undercover capacity, to purchase 50 grams of fentanyl from PARRA. UC-1 was introduced to PARRA by CW-3 as CW-3's "cousin." PARRA was continuing to use telephone number (475) 746-1581. At the direction of agents, CW-3 contacted PARRA via WhatsApp to arrange for the purchase of 50 grams of fentanyl. Following the March 28, 2023 controlled purchase, PARRA had directed CW-3 to communicate with him via WhatsApp, an encrypted application. Also at the direction of agents, CW-2 told PARRA that he was not in Connecticut and that his "cousin" (UC-1) would be conducting the transaction on his behalf, and he provided a contact number for UC-1 to PARRA.

152.    On May 19, 2023, PARRA utilizing (475) 746-1581 sent a text message to UC-1 that stated, "Paker ave Stamford ct" which based on my training, experience, knowledge of this investigation and conversations with UC-1, PARRA wanted UC-1 to travel to Parker Avenue in Stamford for the fentanyl transaction. Approximately one minute later, PARRA followed up with a telephone call to UC-1. The following is an excerpt of the telephone call from PARRA to UC-1:

UC-1 - Hello

PARRA – Hey. You on your way?

UC-1 – I'm about 30 minutes out.

87

PARRA – alright. I'll be ready for you.

UC-1 – alright.

PARRA – On Parker Ave. Park up.

UC-1 – You said Park Ave in Stamford?

PARRA – Yeah. Parker Ave in Stamford, Connecticut.

UC-1 – ok.

153.    Based on my training, experience, knowledge of this investigation and conversations with UC-1, I believe that when PARRA stated, "I'll be ready for you" that he was telling UC-1 that he would be ready with the 50 grams of fentanyl when UC-1 arrived "on Parker Ave." UC-1 was equipped with a kel recorder and provided with a quantity of buy money.

154.    Investigators had established surveillance at PARRA's residence and surveilled PARRA driving the 2014 Infiniti from his residence at 50 Center Street in Stamford to Parker Avenue where he exited the vehicle, entered UC-1's vehicle, met with UC-1 and provided UC-1 with a quantity of fentanyl in exchange for a quantity of buy money. Following the meeting, investigators retrieved a clear plastic baggie from UC-1 containing a whitish colored substance that was submitted to the DEA Laboratory in New York City.  The DEA lab confirmed the presence of a detectable amount of fentanyl in the substance with a net weight of 99.9 grams which was almost twice the amount of the 50 grams of fentanyl that had been agreed upon between CW-2, UC-1 and PARRA.

155.    PARRA had accidently provided approximately 100 grams of fentanyl to UC-1 instead of the 50 grams that had been purchased. CD-1 participated in the May 19, 2023, fentanyl transaction and said that ARCE had again supplied the approximately 100 grams of fentanyl to PARRA that on May 19, 2023, PARRA had provided to UC-1.

156.    In December 2023, UC-1 contacted PARRA on Telephone number ending -9640 to arrange for the controlled purchase of approximately 30 grams of fentanyl from PARRA. On December 14, 2023, UC-1 sent a text message to PARRA on telephone number ending -9640 that stated, "# 50". Based on my training, experience, knowledge of this investigation and conversations with UC-1, "#50" was a coded reference for 50 grams of fentanyl to which PARRA replied from telephone number ending -9640 with "2400" or $2400. PARRA then sent a follow up text message from telephone number ending -9640 that read, "My bad 2500" meaning $2500 for the 50 grams of fentanyl or $50 per gram.  Then on December 19, 2023, UC-1 sent a text message to PARRA on telephone number ending -9640 that stated, "Good morning bro. So bc of the holidays and stuff im short by half but I can come up tomorrow with what I got" meaning that UC-1 only had money for half the order to which PARRA replied, "That's fine so half the # y said right". UC-1 replied with a text message to PARRA on telephone number ending -9640 that read, "Yeah I got 1500 for it" which was the price for 30 grams of fentanyl at the quoted price by PARRA of $50 per gram price.

157.    Later on December 19, 2023, PARRA sent a text from telephone number ending -9640 to UC-1 that stated, "Ok we on" followed by PARRA's trademark "Delete" text. I believe that when PARRA stated "we on" was telling UC-1 that he had the fentanyl read for UC-1. PARRA and UC-1 exchanged text messages agreeing to meet the following day.

158.    On December 20, 2023, PARRA using telephone number ending -9640 sent two text messages to UC-1 that stated, "Parker Ave" and "Stamford ct 06902" which I believe based on my training, experience, knowledge of this investigation and conversations with UC-1, was PARRA providing the meeting location to UC-1.  Investigators equipped UC-1 with a kel transmitter and a quantity of buy money.  The serial numbers of the buy money had been

recorded prior to the controlled purchase. Investigators surveilled UC-1 to the area of Parker Ave.

159.     Investigators also surveilled PARRA driving Subject Vehicle 1 from his residence at 50 Center Street in Stamford to Parker Ave where he met with UC-1 and provided UC-1 with a quantity of fentanyl in exchange for a quantity of buy money. Following the meeting, investigators retrieved a clear plastic baggie from UC-1 containing an off-white colored substance that was submitted to the DEA Laboratory in New York City and confirmatory analysis were positive for a detectable amount of fentanyl with a net weight of 30.7 grams.

160.     CD-1 admitted that he had participated in the December 20, 2023 fentanyl transaction and that ARCE had again supplied the approximately 30 grams of fentanyl to PARRA that on December 20, 2023, PARRA had provided to UC-1.  Based on these transactions, surveillance as well as intercepted calls over the course of the wiretap on PARRA's telephone, I have probable cause to believe that ARCE and PARRA (charged separately) and others conspired to distribute and to possess with intent to distribute fentanyl and heroin **in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846 from approximately January to December of 2023.**

## V.     PROBABLE CAUSE FOR SEARCH WARRANTS

161.     As indicated above, during my tenure as a special agent with the Drug Enforcement Administration, I have investigated and participated in numerous operations which involved drug trafficking violations. Search warrants relating to these investigations have covered vehicles utilized by drug traffickers and their co-conspirators, residences of drug traffickers and their co-conspirators, premises and residences used by narcotics traffickers to

process, "cook," and package narcotics for redistribution, stash houses used as storage locations for controlled substances, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

162.    Materials searched for and recovered in these locations have included various controlled substances and residue of controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of co-conspirators; sales receipts, travel records and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, paging devices, computers, hard drives, thumb drives, computer disks; answering machines; surveillance cameras, corresponding DVRs and hardrives; and various valuable assets such as property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items, obtained by search warrants, constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

163.    Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

i.    Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement;

ii.    Drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

iii.    Even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control

over them;

iv.   Drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

v.   Drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

vi.   Drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs.  Therefore the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

vii.   Drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of current and past drug associates within their residences;

viii.   Drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

ix.   Drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

x.   Drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

xi.   Persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

xii.    Drug traffickers and gang members often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers' and gang members' possession or residence;

xiii.    The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. It is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed compartments, and government and contract mail carriers. The residences of drug traffickers often contain records of drug related travel or shipping records. These records may include shipping receipts, airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

xiv.    Based on my training and experience, drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to, handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers' drugs, drug proceeds, and property;

xv.    Based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug proceeds, drug inventory and drug related paraphernalia in their residences, including within safes or lock-boxes or other closed containers within their residences, or their cars, or in the residences or cars of their trusted associates; based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often have, possess, maintain and control the items listed in this affidavit, in their homes, garages, out-buildings, and cars;

xvi.    Based on my training and experience, I know that persons possess in their residence over which they have dominion and control, documents which indicate their occupancy and/or ownership, such as personal mail, check books, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, telephone answering machine introductions, and undeveloped film containing photographs (when developed) of themselves occupying the property. I also know that individuals engaged in the illegal distribution of controlled substances, often possess cellular telephones and/or "smart phones," in which they store information concerning their illicit activities, such as telephone numbers and contact information for customers, sources and confederates, and photographs of themselves, their customers and confederates, and that information concerning their location and movements and the numbers they have called or have been

called by, as well as the contents of text messages and other nonverbal communications concerning their illicit activities, are stored within such telephones; and

xvii.    Based on my training and experience, drug traffickers also utilize computers or electronic tablets to maintain information, as well as communicate with one another via electronic media or social media.

**Subject Premises One – 22 Frederick Street, Stamford, Connecticut**

164.    As previously noted, based on my training, experience, knowledge of the investigation, and Title III intercepts, in conjunction with coordinated physical and electronic surveillance, I believe **Subject Premises One** to be the residence of Rodney CANADA. As discussed above, CANADA is the leader of a polysubstance drug trafficking organization distributing fentanyl, cocaine and cocaine base in and around Fairfield County and the entire state of Connecticut. The investigation to date has led investigators to believe that CANADA utilizes his residence to store evidence of narcotics trafficking and the proceeds of narcotics transactions.

165.    For example, on March 7, 2024, CANADA had come directly from **Subject Premises One** to meet with Timothy SHANTZ and deliver the fentanyl and cocaine to SHANTZ that was seized from SHANTZ during the "wall off" stop of SHANTZ. Also on March 7, 2024, CANADA traveled directly from **Subject Premises One** to meet with Christopher ADAMS in Norwalk and deliver to ADAMS the approximately 80 grams of cocaine seized from ADAMS on March 8, 2024.

166.    As previously mentioned, in Session 2007 on March 4, 2024, CANADA asked WILLS, "Regular?" to which WILLS replied, "I think it's two (2) though, two (2) of them." Following this intercepted communication, investigators conducting electronic surveillance at **Subject Premises One** observed WILLS arrive at the residence and subsequently depart **Subject Premises One** which I believe was to pick up the "two of them" or a quantity of drugs. In other

examples detailed above including sessions 3382 and 3434 on March 18, 2024, the two arranged for WILLS to grab "2" at CANADA's house and WILLS was observed arriving at **Subject Premises One** and departing approximately four minutes after arriving, which I believe was to pick up the "2" or a quantity of drugs.

167.    Similarly, on April 6, 2024, in session 4799 (also as described above), CANADA made an outgoing call to WILLS and stated, "I need you to go see somebody. Wanna see somebody right quick?" "Kwon D" to which WILLS replied, "Where he at?" CANADA then told WILLS, "You gotta come see me, though." Shortly thereafter, in session 4800, WILLS sent a text to CANADA that stated, "Outside" which I believe indicated that WILLS was outside of **Subject Premises One.** Investigators conducting electronic surveillance observed WILLS arrive to **Subject Premises One** at the time of session 4800 and enter the ground level exterior door.

168.    Approximately two minutes later, WILLS returned to his vehicle and departed. I believe that WILLS obtained the drugs for "Kwon D" from CANADA at **Subject Premises One**. Similarly, in session 6827, as recently as May 6, 2024, CANADA received an incoming telephone call from WILLS and during the intercepted communication, CANADA asked, "I said, you ready for me?" to which WILLS replied, "Yeah! To my um... To the crib, I come out. Yup. I'll hit you, cause I'm going somewhere right now." I believe that CANADA was asking WILLS if he was "ready" with a quantity of drug proceeds to which WILLS responded, "Yeah." CANADA than stated, "A'right and I got your order too. I got your shit." I believe "your shit" was the regular quantity of drugs that CANADA supplied to WILLS. Following session 6827, investigators observed WILLS depart **Subject Premises Three** (WILLS' residence and further described below) and travel to **Subject Premises One.** Based on this conversation, I have probable cause

to believe that the purpose of this travel was to pick up his regular supply of drugs from CANADA.

169.     Additional residents at 22 Frederick Street include CANADA's girlfriend Aminour SHOHAN, coconspirator Alvin NEWTON, Michael HAVENS, coconspirator Jason NIELSEN, Richard NIELSEN and Giaconda NIELSEN. NEWTON, HAVENS and Jason NIELSEN have been intercepted on the CANADA Telephones having pertinent drug related conversations with CANADA.



170.     Unlike the other residences on Frederick Street, as depicted in the above picture, **Subject Premises One** is set back approximately 50 yards from the curb of Frederick Street. **Subject Premises One** is further described as a two-story residence that is white in color with blue shutters and with exterior doors located on the ground level and the second story that is accessed via a staircase that leads to a front porch deck where the exterior door is located. No

other exterior doors are visible from the street view. The number "22" is located to the left of the ground level exterior door affixed to the structure and affixed to the second floor front porch deck. There is a driveway that runs from the curb of Frederick Street the approximately fifty yards to **Subject Premises One**. Parked vehicles and mature trees line the driveway making it nearly impossible to observe the residence without being right in front of it thus risking detection. **Subject Premises One** in a residence that is a perfectly camouflaged, yet conveniently located, and it serves as base of operations for CANADA's drug trafficking activities.

171.     Though the exact interior layout of **Subject Premises One** is unclear, I believe that probable cause exists for a search of the entire structure of **Subject Premises One.** A check of the Stamford online property records database listed Richard and Giaconda NIELSEN as the property owners of Subject Premises One. Records provided by Eversource utility also listed Richard and Giaconda NIELSEN as the utility subscribers to Subject Premises One. Though the Stamford property records database listed Subject Premises One as "Multi Family," Eversource records listed only one electric meter at the property. Investigators have been aided in surveillance by a pole camera that was affixed to a light pole across from the residence.

172.     Though CANADA primarily used the ground level exterior door to enter and exit **Subject Premises One**, because the house is not legally divided into apartments, it is unknown if CANADA has access to some or all of **Subject Premises One**. Further other members of the conspiracy that have been intercepted on the CANADA Telephones including NEWTON, HAVENS and Jason NIELSEN reside at **Subject Premises One** and based on the intercepted communications, have access to common areas in **Subject Premises One** that are used to store controlled substances. Intercepted calls reveal that they all function as redistributors for

CANADA and will be facing state charges based on this investigation. Investigators have no way to establish who, if anyone, controls the interior space within **Subject Premises One** but have established that NEWTON, HAVENS and NIELSEN have a drug trafficking relationship with CANADA.

173.      HAVENS was the subject who texted the image of the 8-ball of cocaine on the scale in data session 21769 on Target Telephone 3, on April 17, 2024 which was at approximately 3:57 PM. At approximately 3:18 PM, HAVENS sent a text message to CANADA that read, "Can I grab one please?" which I believe the "one" was the 8-ball of cocaine displayed in the picture to which CANADA responded by text in session 5706, "put the money in visor then let me know," which I believe was CANADA instructing HAVENS to leave the money in the sun "visor" of a car that was parked at **Subject Premises One**. In session 5707, HAVENS texted, "Omw" or "on my way," which I believe was to **Subject Premises One**. In session 5716, CANADA texted, "It's there" and electronic surveillance showed that CANADA had just arrived at **Subject Premises One** and placed the cocaine in the visor of one of the vehicles that are always parked at **Subject Premises One**. HAVENS responded in session 5717, "Ty sir" or thank you sir and ultimately, I believe it was this drug transaction at **Subject Premises One** between CANADA and HAVENS that led to HAVENS texting the picture of the cocaine.

174.      In regards to NEWTON, in Session 133 over Target Telephone 3 on February 22, 2024, NEWTON using telephone number (516) 610-7903 stated, "I'ma need a couple, little things in a few probably." Then later in the conversation, he stated, "leave one (1) and one (1) in the... Umm Leave it on top of the drawer." I believe that NEWTON was asking CANADA for a small or "little" quantity of drugs which I believe was cocaine and cocaine base ("one and one")

and to "Leave it on top of the drawer" which I believe is a location inside of **Subject Premises One**. Similarly, in session 1067 on February 26, 2024, CANADA received an incoming text from NEWTON that read, "Leave ball on dryer hard." I know that "hard" is common drug vernacular for cocaine base and "ball" is common drug vernacular for an "8-ball" or 3.5 grams of cocaine base. Again, I believe the "dryer" is located inside of **Subject Premises One** where NEWTON and CANADA reside. There were other conversations in which they also referred to leaving drugs on the dryer. In session 6090 on April 21, 2024, CANADA made an outgoing telephone call to NEWTON and during the intercepted communication, NEWTON stated, I just needed a ball, but I'm about to just go to the crib, though" to which CANADA replied, "[a]right, I see you when you get there." I believe a "ball" is a reference to 3.5 grams of cocaine or cocaine base and "crib" is a reference to **Subject Premises One.**

175.     In session 6254 on April 23, 2024, CANADA received an incoming telephone call from NEWTON and during the intercepted communication, NEWTON, asked "thought you was coming home, baby boy." I believe "home" was a reference to **Subject Premises One** to which CANADA replied, "I'll be right there." NEWTON then stated, "I need you, I need you real quick," which I believe NEWTON was asking CANADA for a quantity of drugs to which CANADA replied, "I need you, bro" to which NEWTON responded, "Yeah, I got, I got what I owe from yesterday," which I believe NEWTON owed CANADA a quantity of drug proceeds. NEWTON then stated, "I need you, though. I'm here." I believe that NEWTON was stating that he needed drugs and that he was at **Subject Premises One**. CANADA responded, "Alright" and shortly after this intercepted communication, electronic surveillance observed CANADA return to **Subject Premises One,** which I believe was to provide a quantity of drugs

to NEWTON and receive drug proceeds from NEWTON.  I believe these sessions highlight some of CANADA and NEWTON's drug trafficking activities at **Subject Premises One.**

176.     As to NIELSEN, in session 62 on Target Telephone 4 on March 29, 2024, NIELSEN using (475) 800-3048 sent a text message to CANADA that read, "1k for an ounce? If yes he will want it by 730pm." I believe NIELSEN had a customer who wanted an "ounce" which I believe is an ounce of cocaine. CANADA responded, "Yes" in session 65. In session 117, CANADA made an outgoing call to NIELSEN and during the intercepted communication stated, "[a]nd then so, come on outside, man.  So I can get you this so you can." I believe that CANADA was asking NIELSEN to "come outside" **Subject Premises One.** Following this conversation, investigators conducting electronic surveillance observed CANADA returning to **Subject Premises One,** which I believe was to provide NIELSEN with the ounce of cocaine.

177.     In session 1542 on April 6, 2024, NIELSEN using (475) 800-3048 sent a text message to CANADA that read, "You here ? I need another ball I'll cashapp u 120 put it in the visor lmk when it's there," which I believe NIELSEN was asking CANADA to leave "another ball" or 3.5 grams of cocaine in "the visor" of one of the cars at **Subject Premises One.** CANADA was not at **Subject Premises One** at the time of session 1542 and in session 1543, he replied, "Damn ok I'll let you know but it's gonna be about 12." These sessions are just a sample of some of CANADA and NIELSEN's drug trafficking activities at **Subject Premises One.** Additionally on May 6, 2024 as detailed in paragraphs in 198 to 200, CANADA and WILLS spoke on the telephone to arrange a drug transaction and then WILLS went to Subject Premises One to pick up the narcotics from CANADA.  Additionally, based on pertinent TIII interceptions, and electronic surveillance, I believe there is probable cause that drugs, drug paraphernalia, and drug proceeds being stored inside of **Subject Premises One.**

178.     **Taken together these conversations, combined with other information**

**learned throughout the course of this investigation provide myself and other case agents**

**with probable cause to search Subject Premises One (as further described in Attachment**

**A-1) for evidence of the Target Offenses (as further described in Attachment B-1).**

**Subject Premises Two – 352 Glenbrook Road, Apartment 30, Stamford, Connecticut**

179.     Based on my training, experience, knowledge of the investigation, and Title III

intercepts, in conjunction with coordinated physical and electronic surveillance, the

investigation has identified **Subject Premises Two** as the residence of CANADA's mother

Patricia CARMONA, a.k.a. Patricia CANADA and Paulino CARMONA a.k.a. Paul

CARMONA. (It is unknown if Paul CARMONA is CANADA's father or the spouse of Patricia

CARMONA.)  I have probable cause to believe and do believe that CANADA uses **Subject**

**Premises Two** to store drug proceeds, drug ledgers, amongst other instruments of criminality

(as further described in Attachment B-2).





180.     As described in Attachment A-2, **Subject Premises Two** is located within a two-story, multi-unit senior living apartment complex. Apartment 30 is accessed by an interior hallway. Apartment 30 has a brown exterior door with the number "30" written on it. CANADA's Target Telephone 4 is subscribed to Allen Brooks, 352 Glenbrook Road, Apt. 30, Stamford, Connecticut. BROOKS is listed in NCIC as an alias for CANADA and CANADA provided **Subject Premises Two** to Stamford Police as his current residence following his November 28, 2023 arrest in Stamford for threatening and breach of peace.

181.     I believe that CANADA stores drugs and drug proceeds at both **Subject Premises Two** and **Subject Premises One** to avoid detection. The evidence, that will be documented below, obtained over the CANADA Telephones revealed that CANADA conducts drug related meetings with co-conspirators at **Subject Premises Two** and both Patricia CARMONA and Paulino CARMONA have warned CANADA about police presence near **Subject Premises Two,** which I believe, in addition to the drug related meetings that CANADA holds at **Subject Premises Two**, is an indication that both CARMONAs are cognizant of

CANADA's involvement with the CANADA DTO and aids in establishing probable cause that CANADA uses **Subject Premises Two** to store drug proceeds and drug related ledgers.

182.     In my training and experience, I know it is common for drug traffickers to store controlled substances in a separate location from their drug proceeds as a way of safeguarding their drug related proceeds by not putting all their proverbial eggs into one basket. Thus, when a drug trafficker keeps his drug proceeds separate from his stash of controlled substances, it lessens the chance of losing both if law enforcement or a robbery crew search the drug stash location. Further, in my training and experience, drug trafficking suspects often stash their drug proceeds with a trusted family member to further safeguard the drug proceeds. In this instance, I believe CANADA uses the residence of his mother to store his drug related proceeds.

183.     For example, during the course of the wire intercepts of the CANADA Telephones, CANADA purchased a 2015 2 door Mercedes Benz S Class (**Subject Vehicle 2**) and initially parked **Subject Vehicle 2** in the parking lot of **Subject Premises Two. Subject Vehicle 2** was unregistered in Connecticut and bore a state of Virginia Temporary Tag that remains on **Subject Vehicle 2.**

184.     On April 4, 2024, investigators conducting electronic surveillance of a rental vehicle that CANADA was using at that time observed that CANADA had travelled to **Subject Premises Two** and while the rental vehicle was parked at **Subject Premises Two,** CANADA travelled in another vehicle (possibly **Subject Vehicle 2** though not confirmed) to the Department of Motor Vehicles location in Bridgeport and based on intercepted communication, in an attempt to register **Subject Vehicle 2**.

185.     While CANADA was at the DMV Office and while CANADA's rental vehicle remained parked at **Subject Premises Two**, Patricia CARMONA who was using telephone

number (203) 818-3454, in session 918, sent a text message to CANADA on Target Telephone 4 that read, "Police sitting at the driveway by the church on your way out." I know that the parking lot to **Subject Premises Two** is connected to a neighboring parking lot of a church and in this message, I believe that Patricia CARMONA was warning her son that the police were sitting in the parking lot near **Subject Premises Two** while CANADA's rental vehicle remained parked there. First, I believe this shows Patricia CARMONA's knowledge of her son's criminal activity to warn him that the police were near **Subject Premises Two**, but also I believe Patricia CARMONA was concerned about the police presence near **Subject Premises Two.** Based on the wire intercepts and electronic surveillance, CANADA was not engaging in activity in furtherance of the CANADA DTO at that time. He was attempting to register a vehicle in Bridgeport. In other words, I believe CARMONA's concern about the police near **Subject Premises Two** was concern not only for her son but also for **Subject Premises Two** which furthers establishes probable cause that CANADA uses **Subject Premises Two** to store drug proceeds.

186.    Similarly, three days earlier on April 1, 2024, in session 495, CANADA received an incoming telephone call from Paulino CARMONA using telephone number (914) 564-0588 and CANADA made arrangements to meet Paulino CARMONA at **Subject Premises Two** for personal business. Then in session 497, Paulino CARMONA telephoned CANADA and during the intercepted communication stated, "when you come in don't come in [U/I] [Audio fades] The police is in the parking lot." Again, I believe that this call was an implicit acknowledgement by Paulino CARMONA that he was aware of CANADA's involvement with the CANADA DTO and also concern for the police presence near **Subject Premises Two.**

187.    After Christopher ADAMS' March 8, 2024 arrest in Norwalk and subsequent release from custody, in session 2714 on March 10, 2024, CANADA received an incoming call from ADAMS and during the intercepted communication, CANADA told ADAMS, "so come on down, Meet me at Mami house" to which ADAMS responded, " I'ma call you when I get, when I come down that way." At the time of the intercepted communication, CANADA was at **Subject Premises Two.** Though investigators were not conducting physical surveillance at that time to confirm if ADAMS traveled to **Subject Premises Two,** I believe that this intercepted communication shows that CANADA was comfortable with meeting with ADAMS at **Subject Premises Two** just two days after ADAMS had been arrested and that he may have been meeting with ADAMS to resupply him with narcotics. I believe CANADA uses **Subject Premises Two** to meet trusted co-conspirators to discuss the activities of the CANADA DTO and as such I believe that evidence of the conspiracy including potentially narcotics and drug proceeds and drug ledgers are stored at **Subject Premises Two.**

188.    CANADA also more recently directed his fentanyl source DOZIER to meet him at **Subject Premises Two.** As previously documented in this affidavit, in session 1538 on April 7, 2024, CANADA told DOZIER to meet him at "Mom dukes [PH]". Following this intercepted communication, investigators conducting surveillance observed DOZIER arrive in his Lexus to **Subject Premises Two.** Investigators observed CANADA meet with DOZIER in the parking lot of the apartment building. CANADA remained at **Subject Premises Two** following this meeting. This call suggests that the two met either so that DOZIER could supply CANADA with narcotics, CANADA could pay DOZIER or both.  In either case, it suggests that CANADA likely stores drugs and/or drug proceeds at the residence.

189. Most recently, on May 11, 2024, at approximately 9:46 pm, in session 7216 of Target Telephone 3, CANADA received an incoming call from ADAMS. The following is an excerpt of the conversation between ADAMS and CANADA that ensued:

ADAMS: Are you coming out tonight

CANADA: Yeah! You need to see me?

ADAMS: Yeah! I need the 4-0.

CANADA: A'right, I'll be there

190. Based upon what I learned during the course of this investigation, and training and experience, I believe that "4-0" is a reference to 40 grams of cocaine. I believe that ADAMS asked CANADA to provide ADAMS with 40 grams of cocaine and that CANADA agreed to provide ADAMS with this quantity of cocaine.

191. At approximately 10:49 PM, investigators observed, via electronic surveillance, **Target Vehicle One at Subject Premises Two**. At approximately 10:56 PM, in session 7224, CANADA received an incoming call from ADAMS and CANADA told ADAMS, "Alright, cuz I'm on the highway to you, right now." However, at approximately 10:57 PM, investigators observed, via electronic surveillance, CANADA depart **Subject Premises Two** though this time in **Target Vehicle Two** and travel directly to 43 Taylor Avenue, Norwalk, CT, a residence in Norwalk where CANADA has previously met with ADAMS. Upon arrival at the Taylor Avenue location, in session 7225, CANADA told ADAMS, "I'm outside." Based upon what I learned during the course of this investigation, and training and experience, I believe that

CANADA traveled from **Subject Premises Two** to the area of 43 Taylor Avenue to provide ADAMS with 40 grams of cocaine.

192.     **These calls and communications when combined with observations of CANADA by surveillance, which show him going to Subject Premises Two before and after suspected narcotics related transactions, provide me with probable cause to believe that Subject Premises Two as further described in Attachment A-2 contains evidence of the Target Offenses as further described in Attachment B-2.**

### Subject Premises Three – 216 West Avenue, Darien, Connecticut

193.     Based on my training, experience, knowledge of the investigation, and Title III intercepts, in conjunction with coordinated physical and electronic surveillance, I believe **Subject Premises Three** to be the residence of CANADA DTO member Terrell WILLS. There is probable cause to believe that **Subject Premises Three** is used by the CANADA DTO for the safekeeping of controlled substances. A search of the premises will bear evidence of instruments of criminality associated with drug trafficking organizations like the CANADA DTO.



194.   **Subject Premises Three (as listed in Attachment A-3)** is described as a two-story cape style house that is blue in color with white trim and a white colored front door. The number "216" is affixed to the residence in black lettering to the right of the front door. A check with Eversource identified Shakyia Kendrick as the utility subscriber of **Subject Premises Three**. A check with the Town of Darien online property records database listed the Housing Authority of Darien as the owner of the residence. Based on the Title III intercepts, in conjunction with coordinated physical and electronic surveillance, there is probable cause to believe **Subject Premises Three** is WILLS' residence and that it is used to store narcotics and narcotics proceeds.

195.   As previously mentioned, WILLS has been a constant presence on the intercepts of the CANADA Telephones. WILLS is a primary redistributor of controlled substances (specifically cocaine and cocaine base) distributed by the CANADA DTO and he also acts as a runner for CANADA supplying controlled substances to customers of the CANADA DTO on

behalf of CANADA. Some examples of WILLS' criminal activity were listed above to document the probable cause to arrest WILLS. The investigation has also confirmed that WILLS resides at **Subject Premises Three** and uses **Subject Premises Three** to store controlled substances and drug proceeds.

196.   For example, on February 29, 2024, in session 1451 on Target Telephone 3, CANADA received an incoming telephone call from WILLS who asked CANADA, "What you up to?" to which CANADA replied, "traveling to Greenwich [ph] real quick, but I back, I be right back. WILLS responded, "Um, shit. I'm trynna sit around and wait for you then fuck. Um" to which CANADA replied, "Just give me like 20 minutes" and WILLS replied, "Just hit me, I'ma be on the east side [ph] somewhere most likely." I believe this brief exchange, which is consistent with the intercepted communication between WILLS and CANADA in which their pertinent communications were minimal, shows that WILLS was trying to meet with CANADA to obtain his regular supply of controlled substances. Then in session 1457, WILLS and CANADA agreed to meet at the parking lot of the Reddi Rooster Market located at 1051 E Main Street, Stamford, CT on the "east side" of Stamford. Investigators then observed CANADA meet with WILLS for approximately two minutes in WILLS' Toyota Camry in the parking lot of the market before CANADA returned to his vehicle and departed. I believe based on my training, experience and knowledge of this investigation that this brief interaction between WILLS and CANADA was a drug transaction. Investigators then surveilled WILLS travel directly back to **Subject Premises Three,** which I believe was to store the drugs supplied to WILLS by CANADA.

197.   Similarly, on April 6, 2024 in session 4828, CANADA made an outgoing telephone call to WILLS, and asked, "Yo where you at?" WILLS responded, "Oh shit I been

sitting at the crib. Where you want me to meet you at?" I believe the "crib" was **Subject Premises Three**. CANADA then asked, "Uh.,you ready? Meet me exit 9." WILLS responded, "Alright bet." I have probable cause to believe and do believe that "exit 9" is the vicinity of Exit 9 of I-95 in Stamford and when CANADA asked, "you ready," thatCANADA was asking WILLS if he was ready to receive his supply of drugs. Following this intercepted communication, investigators observed WILLS and CANADA briefly meet in the parking lot of a vape store near exit 9. Following this meeting, which I believe was for CANADA to supply WILLS with a quantity of drugs, investigators surveilled WILLS directly back to **Subject Premises Three.**

198.    On April 10, 2024, in session 5072, CANADA received an incoming telephone call from WILLS and CANADA told WILLS, "Pull up bro." There were no intercepted communications prior to this session number that indicated WILLS was meeting with CANADA. Following this intercepted communication, investigators conducting electronic and physical surveillance observed WILLS arrive in his Toyota Camry to **Subject Premise One,** CANADA exit **Subject Premises One**, enter WILLS' vehicle and after a few minutes, exit the vehicle and return to **Subject Premises One**. Investigators then surveilled WILLS from **Subject Premises One** directly to **Subject Premises Three**.

199.    I believe based on my training, experience and knowledge of this investigation that this brief interaction between WILLS and CANADA was a drug transaction. Investigators then surveilled WILLS directly back to **Subject Premises Three**, which I believe was to store the drugs supplied to WILLS by CANADA. Then later on April 10, 2024, in session 5100, CANADA received an incoming telephone call from WILLS who stated, "I need to see you" to which CANADA replied, "Oh come on. [U/I] Regular" and WILLS responded, "Yeah". I

believe that "regular" is WILLS regular or daily supply of drugs from CANADA and I also believe that when CANADA stated, "Oh come on" that CANADA was surprised that WILLS needed additional drugs as CANADA had already provided WILLS with drugs earlier that day.

200.    Investigators conducting electronic surveillance observed WILLS arrive at **Subject Premises One**, enter **Subject Premises On**e and less than two minutes later exit the residence, return to his vehicle and depart. Investigators than surveilled WILLS to **Subject Premises Three**. WILLS travelled directly back to **Subject Premises Three** though WILLS did stop for gas at a gas station near his residence. I believe based on my training, experience and knowledge of this investigation that this brief interaction between WILLS and CANADA was a drug transaction. Investigators then surveilled WILLS directly back to **Subject Premises Three** which I believe was to store the drugs supplied to WILLS by CANADA.

201.    Again, most recently, in session 6827, on May 6, 2024, CANADA received an incoming telephone call from WILLS. The following is an excerpt of the intercepted communication:

CANADA:    You ready for me? [Pause] Huh?

WILLS:    You could hear me?

CANADA:    A'right, I got... I got some... I got for you. [Voices Overlap]

WILLS:    You could hear me?

CANADA:    Yeah. I said, you ready for me?

WILLS:    I didn't hear you.

CANADA:    I said, you ready for me?

WILLS:    Yeah! To my um... To the crib, I come out. Yup. I'll hit you, cause I'm going somewhere right now..

CANADA:     A'right and I got your order too. I got your shit.

WILLS:      Yep. A'right. Yep!

202.    I believe that when CANADA asked, "you ready for me?" that CANADA was asking WILLS if he had drug proceeds for him. WILLS responded, "yeah" and then when CANADA stated, "A''right and I got your order too. I got your shit," that in addition to CANADA receiving the drug proceeds from WILLS that CANADA also had drugs ("I got your order too. I got your shit.").

203.    Following this intercepted communication, investigators surveilled WILLS travel from **Subject Premises Three** to **Subject Premises One** to meet with CANADA. I believe WILLS provided a quantity of drug proceeds that WILLS obtained from **Subject Premises Three** in addition to receiving drugs from CANADA.

204.    **Based on the above, I believe probable cause exists to believe that WILLS uses Subject Premises Three (as further described in Attachment A-3) to store controlled substances and drug proceeds or evidence of the Target Offenses (as further described in Attachment B-3).**

**Subject Premises Four – 511 Shippan Avenue, Apartment 4F, Stamford, Connecticut**

205.    Based on my training, experience, knowledge of the investigation, and Title III intercepts, in conjunction with coordinated physical and electronic surveillance, I believe **Subject Premises Four** to be the residence of CANADA DTO member Julio SANTOS a.k.a. Abdul SANTOS. SANTOS is a coconspirator of CANADA who redistributes cocaine and cocaine base and heroin/fentanyl for the DTO and also cooks cocaine for CANADA.  SANTOS is being charged separately by the State for his involvement in this investigation. There is probable cause to believe that Subject Premises Four is used by the CANADA DTO for the

112

processing, packaging and safekeeping of controlled substances. A search of the premises will bear evidence of instruments of criminality associated with drug trafficking organizations like the CANADA DTO.

206.    SANTOS resides at 511 Shippan Avenue, Apartment 4F, Stamford, Connecticut ("**Subject Premises Four**") which I believe is a location SANTOS uses to store and process controlled substances for the CANADA DTO. As described in Attachment A-4, **Subject Premises Four** is a multi-story apartment building. Apartment 4F is located on the fourth floor. Apartment 4F has a brown colored wooden door with "4F" posted to the left of the door. A Google search listed the address as Harboursite affordable rental housing community for seniors run by the National Church Residences (NCR). Records provided by Eversource listed N C R of Stamford as the utilities subscriber to apartment 4F.







207.    In March 2024, a member of Stamford NOC was interviewing SANTOS as part

of his law enforcement duties and SANTOS told the investigator that he resided at 511 Shippan

Avenue with his girlfriend, Candice SARRO. In 2022, Stamford Police interviewed SARRO

who was residing in apartment 4F as part of an overdose investigation. On April 25, 2024,

Stamford Police interviewed SARRO as part of an assault investigation. SARRO provided **Subject Premises Four** as her address to police. Police reviewed surveillance video from the building and identified SANTOS as the victim of the assault though police did not interview SANTOS as part of the investigation.

208.    Julio SANTOS has been intercepted over Target Telephone 3 on multiple occasions using telephone number (475) 309-9103. This number has been tied to him through recorded calls and surveillance.   His intercepted calls with CANADA, combined with surveillance provide probable cause to search **Subject Premises 4** for evidence of the Target Offenses.  For example, in session 3916, on March 30, 2024, CANADA received an incoming telephone call from SANTOS. The following is an excerpt of the intercepted communication:

CANADA:          Yo. Ya...

SANTOS: This is Prem, this is Prem?

CANADA:          Yeah.

209.    I believe "Prem" is CANADA's alias of "Supreme" or "Prem" for short. The conversation continued:                                                                                                     .

SSANTOS:          Yeah, I've I've been, I've been waiting for you since last-Since like this morning, but um...  but, I've been trying, like...  I was gonna... get you...  I went like,  'yo, wait.' That shit  [U/I] I didn't even... I forgot that I didn't even save your number yesterday. I was so busy...

CANADA:          Yeah, yeah, yeah.

SANTOS: And I just see,  I just seen text. I'm like, 'what?;'  I'm I'm like, 'What the fuck.".'  I'm trying to make... Put it together and shit. But nah, I been ready for you. Like, I've been ready.

CANADA:       Alright.  Well, where you at?

SANTOS: I'm in my... **I'm in my crib, 511 Shippan Avenue.  Across the street form the uh... um... form the um.. Park... the beach.**

CANADA:       A'ightA'ight, a'ighta'ight, just [Voices Overlap]

SANTOS:  Been there.  Alright. Uh, yeah, I been ready like that.

CANADA:       [U/I]

SANTOS:  Yeah man, been ready for you man.  I been trying to see you since this morning and then I took a nap too. But yeah man, ASAP, I need to see you.

CANADA:       Alright. Say less. I got you. I' m getting a hair cut right now. A soon as I'm done, I'm right there.

SANTOS:  A'ight. Please please. A'right. Bye.

210.    In this call, SANTOS confirmed that he resided at **Subject Premises Four** when he stated, "I"m in my  crib, 511 Shippan Avenue." I further believe, when CANADA stated, "Alright. Say less. I got you" that CANADA had a quantity of drugs for SANTOS. Following this intercepted communication, investigators conducting surveillance observed CANADA quickly meet with SANTOS in front of **Subject Premises Four**, which I believe was to provide a quantity of drugs to SANTOS.

211.    In session 4082, late on March 31, 2024, CANADA sent a text message to SANTOS that read, "paper Tomorrow" followed by "110 each" in session 4097, which had become April 1, 2024. I believe "paper" is common drug vernacular for dosage units of heroin or fentanyl and $110 was the price for a "bundle" or 10 dosage units of heroin or fentanyl.

212.    In session 4099, SANTOS responded, "So I owe for one am I correct" meaning he owed CANADA for one bundle to which CANADA responded "Facts" (session 4100). SANTOS replied, "I got that and more already" (session 4101). Later in the morning, on April 1, 2024, CANADA sent an outgoing text to SANTOS that read, "You know how to chef??" which I believe was CANADA asking SANTOS in coded language if he knew how to convert cocaine into cocaine base. CANADA then telephoned SANTOS in session 4173 and told SANTOS to "come downstairs real quick" in order for CANADA to meet with SANTOS in person which I believe was to discuss SANTOS converting the cocaine to cocaine base. This belief was reinforced in session 4202 later that day on April 1, 2024. The following was an excerpt from the intercepted communication:

CANADA:    Yo.

SANTOS: Hey, boss.

CANADA:    Yo.

SANTOS: Before I... before I, um... Chef Boyardee, Chef Boyardee this stuff... It look like you got some shit in there, man.

CANADA:    What?

SANTOS: I don't know what you guys done to that shit, like... It, it got the shine and everythin' but it's not, it's not like, you know, it's like, like, the original... shine, like... it look like it got a little bit of... you know?

213.    I believe that SANTOS's reference to "Chef Boyardee, Chef Boyardee this stuff" was coded language for converting cocaine into cocaine base also referred to as cooking crack which I believe SANTOS was doing at **Subject Premises Four**. SANTOS stated, "... It look like you got some shit in there, man," I believe that the cocaine SANTOS was preparing for CANADA did not look pure. The conversation continued with more specific references to cooking the cocaine.

214.    In session 4954, on April 9, 2024, CANADA made an outgoing call to

SANTOS. The following is an excerpt of the intercepted communication:

CANADA:        Did you tell Rob [ph] that, that was seven (7).

SANTOS:        Yeah! I told 'im and he tried to tell me that, that was 10; so I'm

like, " Bro', this don't look like 10."  So when I got home, I called him.  I gave

him a call.

CANADA:     No, that's was 10.

SANTOS:        Oh, but what he gave me... what he gave me was not 10.

214.    I believe when CANADA asked "Did you tell Rob [ph] that, that was seven (7)."

That" CANADA was asking SANTOS if SANTOS had asked "Rob" (possibly a subject

intercepted identified as Rob MOORE) if the amount of drugs "Rob" had given SANTOS

was "7" grams. SANTOS replied, "that was 10; so I'm like, "'Bro,' this don''t look like

10.'" CANADA then replied, "that's was 10." But SANTOS insisted, "what he gave me was

not 10" which I believe was 10 grams of drugs. The conversation continued with more

discussions about drugs.

CANADA:     I guarantee that shit I gave him, I gave him 10 for  [U/I]


SANTOS:        So he got... he took the other half (.5) Preme.  You feel me.  He

got it

CANADA:     A'ight. A'ight, I'ma holla, I'll I'll ask him but yeah that [U/I]

SANTOS:        I'ma ask him too because, yo, he told me it was three (3). He told

me yesterday, " 'A'right, a'right, 240.", ,' he said.

CANADA:     Yeah! cause that was... that was a definite 10.

SANTOS:     Yeah! But not what he gave me. You feel me Preme.  A'ight.. it looked it small, so  I'm like "'Damn, my nigga, this shit look small, like,','"  you know like, I need that... I need that, this amount . You know the amount that I want.  You feel me.

CANADA:     Yeah!

SANTOS:     To do my thing. You know.  Hey Preme, let me call you right, right back. I gotta go downstairs and see somebody.  I'm putting this... I'll all you in five minutes.

CANADA:     A'right.

215.    In this call, I believe that CANADA and SANTOS were continuing discussing if SANTOS received the full ten grams as CANADA stated "I gave him 10" and SANTOS then stated, "But not what he gave me. You feel me Preme.  .. it looked it small." Of note, while on this call, SANTOS was in **Subject Premises Four** and indicated that he had to "go downstairs and see somebody" or serve another drug customer while talking to CANADA.

216.    On April 11, 2024, in session 5207, CANADA made an outgoing telephone call to SANTOS. The following was an excerpt from the intercepted communication:

CANADA:     What's going on?

SANTOS:     Ain't nothin', big boss. Taking it easy. I was at the Grands; just came to the crib real quick.

CANADA:     Oh, okay, okay. [Voices overlap]

SANTOS:     'Cause I had do something for Sliz and shit. [Pauses] You know?

CANADA:     Jeff [ph] setting it up for Sliz?

SANTOS:     Yeah.

119

CANADA:     Okay.

SANTOS:     Got a little job with them and shit, you know?

CANADA:     You got a job with them? To do what? Cheffing up?

SANTOS:     Yeah, cheffing up, you know ,like you know what I'm saying, and they pay me.

217.     In this call in pertinent, I believe when SANTOS stated that he "Got a little job" with "Sliz" to be "cheffing up" that SANTOS was processing drugs for a subject named "Sliz" in addition to being part of the conspiracy with the CANADA DTO. The conversation continued:

CANADA:     Oh, a'ight. [Voices overlap]

SANTOS:     Um, yeah, yeah. So, um, nah, yeah. Just trynna rep up, man, and... So, I'm trynna to give you some bread and shit.

CANADA:     You finished those bundles?

SANTOS:     Nah, nah. I finished one (1). I got one (1).

CANADA:     A'ight. You finished one (1)?

SANTOS:     Yeah I got one (1) off.

CANADA:     A'ight. They love it?

SANTOS:     Yeah... I... I said that... Depend, depending on some... The people, that some people got like, high tolerance. But um, I gave it to one person. They said that... It was that it took, it took a long time to like... Like to, to... to get them good. I don't know something like that. But... Because the, the person that I gave it, was like ...real

soon; it took, you know, it took their sickness away. But I'm

waiting for them to like, tell me like, you know?

CANADA:     A'ight.

218.     I believe when CANADA asked "You finished those bundles?" that CANADA

was asking SANTOS if he had finished selling "bundles" which I know is common drug

vernacular for ten dosage units of fentanyl or heroin that are rubber banded or "bundled"

together.  I further know from the wall off seizure conducted on SHANTZ (described above)

that CANADA sells bundles of fentanyl stamped with the "Black Jack" label. SANTOS replied,

"I finished one (1). I got one (1)." CANADA asked, "They love it?" which I believe was

CANADA asking SANTOS if the customers had liked the potency of the fentanyl to which

SANTOS callously replied, "Depend, depending on some... The people, that some people got

like, high tolerance. But um, I gave it to one person. They said that... It was that it took, it took a

long time to like... Like to, to... to get them good" regarding the potency of the fentanyl.  The

conversation callously continued regarding what drug users were saying about potency of the

fentanyl.

219.     Similarly, in session 6229 on April 23, 2024, CANADA received an incoming

telephone call from SANTOS who stated, "What I gotta give you, what I gotta give you for that,

what you gave me? [U/I] eleven." to which CANADA replied, "that was 10 and a half. So you

gotta give me [pause] uh, 320. I believe that CANADA had given SANTOS "10 and a half"

grams of cocaine for which SANTOS owed "320". Then in session 6268 later that day,

CANADA made an outgoing call to SANTOS and asked, "what you got for me?" SANTOS

replied, "Like 200". CANADA then stated, "I want that. Let me, come grab it. I'll be there."

Following this intercepted communication, investigators conducting electronic surveillance

observed CANADA in the vicinity of **Subject Premises Four** which I believe was for CANADA to pick up the $200 in drug proceeds that SANTOS had stored at **Subject Premises Four**. I further believe based on my training, experience and knowledge of this investigation that SANTOS had stashed the 10 and a half grams of cocaine at **Subject Premises Four.**

220.   I believe this intercepted communication clearly shows that despite the known dangers of one fatally overdosing on fentanyl, that the profit from the sale of fentanyl was of greater concern to the CANADA DTO then someone overdosing on fentanyl as CANADA stated, "Do what you gotta do, man" which I believe was CANADA telling SANTOS to make sure to increase the potency of the fentanyl.  Aside from cooking cocaine at his house, I believe that SANTOS is also packaging and storing fentanyl/heroin there.  Although SANTOS was not intercepted in the past two weeks on the wire, I do not believe that he has stopped packaging, cooking and storing drugs at his house.  Moreover, it is likely that evidence of his cooking, storing and packaging, including drug residue and other paraphernalia, is still at his residence from those earlier calls. I believe that in light of the number of the calls intercepted over the course of the wire over a lengthy period, that there is probable cause to believe that evidence of the Target Offenses will be found in **Subject Premises Four.**

221.   **Based on the above, I believe probable cause exists to believe that SANTOS uses Subject Premises Four (as further described in Attachment A-4) to store controlled substances and drug proceeds or evidence of the Target Offenses (as further described in Attachment B-4).**

### Subject Premises Five – 98 Hoyt Street, Apartment 5E, Stamford, Connecticut

222.   Based on my training, experience, knowledge of the investigation, and Title III intercepts, in conjunction with coordinated physical and electronic surveillance, I believe **Subject**

**Premises Five** to be the residence of CANADA DTO member Ramion BAKER. There is probable cause to believe that **Subject Premises Five** is used by the CANADA DTO for the safekeeping of controlled substances and specifically by BAKER for the safekeeping of his narcotics, packaging materials and other narcotics paraphernalia. A search of the premises will bear evidence of instruments of criminality associated with drug trafficking organizations like the CANADA DTO.  Below are pictures of the residence.





223.    **Subject Premises Five (as listed in Attachment A-5)** is described as a multi-story apartment building. Apartment 5E is located on the fifth floor and "5E" is affixed to a brown colored door to the apartment. Investigators obtained a copy of the rental agreement for

**Subject Premise Five** from the management office of the apartment building that listed BAKER as the renter of **Subject Premises Five** since May 24, 2023.

224.     As of May 7, 2024, investigators observed a BMW 528xi bearing Connecticut Registration BM75135 used by BAKER parked in the enclosed parking garage of 98 Hoyt Street in spot #11. Investigators further observed a silver-colored Mercedes Benz also used by BAKER that was parked next to the BMW in spot #12.  Investigators confirmed with the leasing office of the apartment building that spot #12 in the enclosed parking garage of 98 Hoyt Street is assigned to Baker and his apartment of #5E, for which he is on the lease. Based on the Title III intercepts, in conjunction with coordinated physical and electronic surveillance, there is probable cause to believe **Subject Premises Five** is BAKER's residence and that it is used to store narcotics and narcotics proceeds and other drug related paraphernalia.

225.     As previously mentioned, BAKER is a primary redistributor of controlled substances (specifically heroin and fentanyl, cocaine and cocaine base) distributed by the CANADA DTO. Some examples of BAKER's criminal activity in furtherance of the conspiracy were listed above to document the probable cause to arrest BAKER including the April 30, 2024 controlled purchase of 11 dosage units or "bags" of fentanyl stamped "Black Jack" from BAKER by CW-1.

226.     On April 30, 2024, investigators were also conducting court authorized electronic surveillance of BAKER's BMW and observed that immediately following the controlled purchase from CW-1, BAKER traveled back to **Subject Premises Five**, which I believe was to store the buy money that BAKER had obtained from CW-1.

227.     Similarly, on May 4, 2024, in session 6686 on Target Telephone 3, CANADA received a text message from a Raul CASTILLO, one of CANADA's regular customers who

asked, "No more white?!" which I believe "white" was cocaine. In session 6687, CANADA responded, "Later on tonight or tomorrow for sure." Following this intercepted communication, investigators conducting electronic surveillance observed that CANADA was at **Subject Premises Five.** This was confirmed in Session 5151 of Target Telephone 4 during an intercepted communication between CANADA and his brother, Jarrod CANADA and during the intercepted communication, CANADA placed BAKER on the telephone. After investigators observed that CANADA departed BAKER's residence, CANADA immediately started contacting his regular customers including CASTILLO to distribute cocaine to them. I believe that CANADA travelled to **Subject Premises Five** in order to be supplied a quantity of cocaine from BAKER. I further believe that BAKER stores narcotics at his residence, which he provided to CANADA for that transaction.

228.    Then on May 5, 2024, investigators conducting electronic surveillance observed CANADA travel to the area of **Subject Premises Five** for approximately five minutes, and then travel to the area of Glenwood Road and East 26th Street in Brooklyn, New York for less than thirty minutes before traveling directly back to **Subject Premises Five.** Based on my training and experience and knowledge of this investigation, I have probable cause to believe that CANADA traveled from **Subject Premises Five** to Brooklyn with BAKER for the purpose of obtaining narcotics.

229.    Finally, as detailed in paragraph 61, BAKER has a Taurus firearm that he refers to on the call described above and I have reason to believe that he has that firearm illegally as a convicted felon and uses it in furtherance of his drug trafficking. Accordingly, there is also probable cause to search **Subject Premises Five** for firearms and ammunition.

230.    Based on the above, I believe probable cause exists to believe that BAKER uses Subject Premises Five (as further described in Attachment A-5) to store controlled substances and drug proceeds, as well as firearms and ammunition, and other evidence of the Target Offenses (as further described in Attachment B-5).

### Subject Premises Six – 40 Clinton Ave., Apartment 301, Stamford, Connecticut

231.    Based on my training, experience, knowledge of the investigation, and Title III intercepts, in conjunction with coordinated physical and electronic surveillance, I believe **Subject Premises Six** to be a stash apartment of CANADA DTO member Ramion BAKER. There is probable cause to believe that **Subject Premises Six** is used by the CANADA DTO for the safekeeping of controlled substances. A search of the premises will bear evidence of instruments of criminality associated with drug trafficking organizations like the CANADA DTO.



232.    **Subject Premises Six** is described as an apartment located a multi-story apartment building. Apartment 301 is located on the third floor of the building. Apartment 301 has a tan colored door with the number "301" appearing to the left of the door. Investigators identified Lisa BILLINGS as the current occupant of **Subject Premises Six**. Stamford Police have had contact with BILLINGS at **Subject Premises Six** as recently as April 2024 regarding a noise complaint.

BILLINGS also had prior contact with Stamford Police related to illegal drug usage. I know it is common for street level drug dealers to stash drugs in residences of drug users who receive payment in drugs for allowing a dealer to stash their drugs. I believe this is the arrangement that BAKER has with BILLINGS for BILLINGS allowing BAKER to stash controlled substances in her apartment.

233.     As detailed above, on both the April 29, 2024 and May 3, 2024 controlled purchases from BAKER, while meeting with CW-1, BAKER told CW-1 that he needed to get additional "bags" of fentanyl for CW-1 and was observed on both occasions entering the front entrance of 40 Clinton Avenue. Investigators subsequently obtained surveillance video from the apartment building and on both the April 29, 2024 and May 3, 2024 controlled purchases, BAKER was observed on building security video entering and exiting Subject Premises Six during the controlled purchase operations which I believe was to retrieve the additional bags of fentanyl that BAKER provided to CW-1. The fact that BAKER traveled directly to and from the residence before and after the buy suggests to me that he likely stores fentanyl at this stash house and because he is selling smaller quantities that he may also have packaging materials and other drug related paraphernalia at the residence.

234.     **Based on the above, I believe probable cause exists to believe that BAKER uses Subject Premises Six (as further described in Attachment A-6) to store controlled substances and drug proceeds or evidence of the Target Offenses (as further described in Attachment B-6).**

**Subject Premises Seven – 2612 North Avenue., Unit A1, Bridgeport, Connecticut**

235.     Based on my training, experience, knowledge of the investigation, and Title III intercepts, in conjunction with coordinated physical and electronic surveillance, I believe **Subject**

**Premises Seven** to be the residence of CANADA DTO member Michael HAMMETT. There is probable cause to believe that **Subject Premises Seven** is used by the CANADA DTO for the safekeeping of a large quantity of drug proceeds. I have probable cause to believe and do believe that a search of the premises will bear evidence of instruments of criminality associated with drug trafficking organizations like the CANADA DTO.



236.     **Subject Premises Seven** is a two-story town house style residence located in a gated community. **Subject Premises Seven** is gray in color with brick incorporated into it. There is a black colored front door with "A1" affixed to the door. A check of the Bridgeport online property records database listed Michael HAMMETT as the owner of **Subject Premises Seven**. Michael HAMMETT has the following criminal history: (a) November 3, 2011 conviction in the District of Connecticut for conspiracy to distribute cocaine for which Michael HAMMETT was sentenced to 18 months prison followed by 36 months' supervised release.

237.     As for background, the investigation identified Gavin HAMMETT, the brother of Michael HAMMETT as a possible source of supply for the CANADA DTO. Gavin HAMMETT has two prior convictions in the District of Connecticut. On July 24, 1997, Gavin HAMMETT was convicted of possession with intent to distribute cocaine and sentenced to 105 months' prison followed by 5 year's supervised release and on October 13, 2011, he was convicted of conspiracy to distribute cocaine and sentenced to 20 years' prison followed by 8 years supervised release. Gavin HAMMETT is currently serving his term of supervised release from the 2011 conviction.

238.     Based on the intercepted communications coupled with investigators conducting physical and electronic surveillance of CANADA, law enforcement observed that on February 23, 2024, CANADA traveled to Norwalk to meet with ADAMS (detailed above). After meeting with ADAMS, CANADA traveled to Gavin HAMMETT's residence at 3300 Park Avenue, Unit #5, Bridgeport, Connecticut remained there for approximately 15 minutes, and then returned directly to ADAMS, which I believe was to provide ADAMS with a quantity of cocaine that I believe CANADA had obtained from Gavin HAMMETT.

239.     On March 19, 2024, CANADA travelled from Stamford at approximately 11:00 PM to Gavin HAMMETT's residence for approximately 30 minutes and then travelled directly back to **Subject Premises One**. I believe this late-night travel is indicative of a drug transaction. Then on April 5, 2024, CANADA travelled to 50 Ridgefield Ave., Bridgeport, Connecticut which is a multi-story apartment complex. Based on physical and electronic surveillance of Gavin HAMMETT, investigators identified apartment 407 as a location that Gavin HAMMETT goes to and a potential stash apartment for Gavin HAMMETT. Investigators reviewed building surveillance video from CANADA's travel to 50 Ridgefield Avenue, and though investigators could not determine which apartment CANADA went to, video of CANADA leaving the building

through a stairwell showed that CANADA's jacket had a significant budge in it that it did not have when CANADA arrived at the building. I believe that CANADA acquired a quantity of drugs at 50 Ridgefield that he had stashed in his jacket as he was exiting the building. CANADA travelled directly back to **Subject Premises One** providing further probable cause for the requested search of **Subject Premises One.**

240.     Also, between March and May 2024, investigators conducted multiple controlled confidential source purchases of fentanyl from Gavin HAMMETT at 3300 Park Ave., Bridgeport, CT, and also observed him conducting other narcotics transactions.

241.     For example, during the week of April 21, 2024, investigators utilized CS-1 to conduct a controlled purchase of approximately 3.5 grams of fentanyl from Gavin HAMMETT. Gavin HAMMETT was utilizing telephone number (475) 455-7545 at that time.  At the direction of agents, CS-1 contacted Gavin HAMMETT to arrange for the purchase of 3.5 grams of fentanyl. Gavin HAMMETT directed CS-1 to his residence at 3300 Park Avenue, Unit 5, Bridgeport, CT for the controlled purchase (as he had previously).

242.     CS-1 has been working as a source for the Stamford Police Department since January 2024.  CS-1 has no criminal history and is providing information and services to Stamford Police in exchange for financial compensation. CS-1 has provided reliable and timely information that has been corroborated.  (CS-1 had previously purchased 10 grams of fentanyl from Gavin HAMMETT and his brother).

243.     For this controlled purchase at the end of April, investigators had established surveillance at Gavin HAMMETT's residence. CS-1 was equipped with a quantity of buy money. CS-1 and CS-1's vehicle were searched for contraband with negative results. CS-1 purchased approximately 3.5 grams of fentanyl, which was returned to agents.

244.     During the month of May 2024, investigators conducted surveillance on Marvin ALLEN operating a green Honda Civic bearing Connecticut registration 7AWTM2 which is a suspended registration belonging on a Saab 9-5. ALLEN and his vehicle were observed arriving to Gavin HAMMETT's residence a few minutes prior to the second controlled purchase from Gavin HAMMETT and departing prior to CS-1's arrival and travelling directly to the 50 Ridgefield apartment which I believe is used by Gavin HAMMETT (who works with Michael HAMMETT) as a stash location. ALLEN is the utility subscriber to apartment number 403 at the 50 Ridgefield location. Gavin HAMMETT was observed traveling to that apartment following the controlled purchase from CS-1.

245.     Investigators conducting surveillance of ALLEN during the week of May 1, 2024 observed ALLEN making multiple trips to various locations throughout Bridgeport. While at these locations ALLEN would conduct quick meetings with various unidentified and seemingly random people. ALLEN would return to 50 Ridgefield Avenue before moving to another location and meeting with more people. Based on my training, experience and knowledge of this investigation, I believe that ALLEN was conducting street level drug transactions and utilizing the apartment at 50 Ridgefield Avenue #403 as a location to store the majority of the narcotics while conducting narcotics transactions on behalf of the Gavin HAMMETT and likely also Michael HAMMETT as law enforcement believes them to be working together.

246.     During the week of May 6, 2024, DEA investigators in Bridgeport were contacted by DEA investigators in New York City and according to DEA investigators in New York, they had debriefed a Confidential Source (CS-1) who provided information related to Michael HAMMETT and **Subject Premises Seven**. CS-1 has been a DEA CS since 2013 though not continuously. CS-1 provides information and services to the DEA in exchange for financial

compensation. An NCIC check for CS-1 was negative. The CS has provided reliable and truthful information to DEA investigators that has been corroborated and led to the seizures of drugs and drug proceeds.

247.    According to CS-1, he had travelled to **Subject Premises Seven** sometime between late April 2023 and May 2024. CS-1 met with Michael HAMMETT who had contacted CS-1 in an attempt to obtain a new source of supply for kilogram quantities of cocaine. Michael HAMMETT told CS-1 that he primarily dealt with the laundering of drug proceeds but had a relative who had a significant role in the drug trafficking operation. I believe this relative is Gavin HAMMETT. While at **Subject Premises Seven**, CS-1 observed a safe within the residence that contained several hundred thousand dollars in drug proceeds. CS-1 was shown the Connecticut Driver's License photograph of Michael HAMMETT and positively identified the photograph as the subject he met at **Subject Premises Seven.**

248.    **Based on the above, I believe probable cause exists to believe that Michael HAMMETT uses Subject Premises Seven (as further described in Attachment A-7) to store controlled substances and drug proceeds or other evidence of the Target Offenses (as further described in Attachment B-7).**

## Subject Vehicles

249.    **The Subject Vehicles One and Two** identified above and referenced throughout the affidavit are those known to be utilized by members of the CANADA DTO, specifically Rodney CANADA and both have been seen at the various stores and residences listed above or during suspected drug and drug-related transactions throughout the course of this investigation. Probable cause to search the two cars for evidence of the Target Offenses is provided by those examples.

250.     **As for Subject Vehicle One**, in one recent example, on April 16, 2024, law enforcement received information that CANADA would be traveling to a specific location within Stamford, CT in order to conduct a narcotics transaction. Stamford Police Officers set up surveillance in the area of the suspected narcotics transaction and observed CANADA arrive at the meet location for the suspected narcotics transaction operating **Subject Vehicle 1.** After the suspected narcotics transaction, CANADA drove away in **Subject Vehicle 1** and conducted anti-law enforcement maneuvers to avoid detection.  This, and other examples and information learned throughout the course of this investigation, provides me with probable cause to believe that CANADA stores drugs and drug proceeds in Subject Vehicle 1 and uses it to serve customers.

251.     **As for Subject Vehicle Two,** most recently in the evening of April 25, 2024, the Task Force intercepted a series of calls which indicated that CANADA would be travelling to a specific location in Bridgeport, CT for the purpose of picking up monetary proceeds from a narcotics dealer and close associate of CANADA.  On this occasion, CANADA was observed to be driving **Subject Vehicle Two** to meet with his sources of supply and to depart in **Subject Vehicle Two** after the pickup.  Again, this provides me with probable cause to believe that CANADA uses **Subject Vehicle Two** to conduct narcotics related activities and that evidence of the Target Offenses are likely to be found in this vehicle.

252.     **It has been demonstrated throughout this affidavit that Subject Vehicle One and Two have been used in furtherance of the CANADA DTO and are proceeds of the CANADA DTO and are subject to asset forfeiture. As such, there is probable cause to believe that a search of the Subject Vehicles is likely to lead to the discovery of admissible evidence concerning the violations of law set forth above.**

## CONCLUSION

253.     Based upon the information presented above, I believe that Rodney CANADA a.k.a. "Supreme," Terrell WILLS a.k.a. "Black Fred," Ramion BAKER a.k.a. "Ray Ray," Willi BAZELAIS, Alvin NEWTON a.k.a. "Butters", Christopher ADAMS, Gerald COLEY a.k.a. "G-Rock", Benjamin DOZIER, Danny TURKVAN, a.k.a. "Smooth," Julio SANTOS aka "Domi" aka "Abdul", Lamont COREY a.k.a. "DJ," Gavin HAMMETT, Michael HAMMETT, Jimmy ARCE, a.k.a. "Boe,", a.k.a. "Slim," a.k.a. "Jimbo," and others are engaging in a continuing course of narcotics trafficking activity in violation of Title 21, United States Code, Sections 841 and 846 (conspiracy to distribute and to possess with intent to distribute narcotics) and Title 21 United States Code, Section 841 (possession with intent to distribute narcotics). I am seeking arrest warrants at this time for CANADA, WILLS, BAKER, BAZELAIS, ADAMS, COLEY, DOZIER, TURKVAN and ARCE for violations of the Target Offenses. Further, based upon the investigation to date, I believe Subject Premises One through Seven, and that Target Vehicles One and Two are used to store evidence, fruits, instrumentalities and proceeds of narcotics trafficking as more specifically set forth in Attachment B for each search warrant.

## REQUEST FOR SEALING

254.     Your affiant believes that public disclosure of the within affidavit and public disclosure of the existence of the arrest warrants for the above-named persons and search warrants for the above-named Subject Premises and Vehicles may tend to; compromise the investigation; cause suspects to flee in order to avoid apprehension; and cause suspects and their confederates to destroy physical evidence or conceal proceeds of criminal activity. Accordingly, your affiant respectfully requests that the Court seal this affidavit and the accompanying

warrants in order to avoid jeopardizing an ongoing investigation and the safety of law enforcement personnel and others.

_____
Andrew Hoffman
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this 13th day of May, 2024, at Bridgeport, Connecticut.

_____
HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

135

### ATTACHMENT A-1
**Property to Be Searched**

**Subject Premises One – 22 Frederick Street, Stamford, Connecticut**



    **Subject Premises One** is set back approximately 50 yards from the curb of Frederick Street. **Subject Premises One** is a two-story residence that is white in color with blue shutters and with exterior doors located on the ground level and the second story that is accessed via a staircase that leads to a front porch deck where the exterior door is located. No other exterior doors are visible from the street view. The number "22" is located to the left of the ground level exterior door affixed to the structure and affixed to the second-floor front porch deck. There is a driveway that runs from the curb of Frederick Street the approximately fifty yards to **Subject Premises One**. Parked vehicles and mature trees line the driveway.

## ATTACHMENT B-1
### Particular Things to be Seized

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and

car rental statements, correspondence with travel agencies and other travel related businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.

**ATTACHMENT A-2**
**Property to Be Searched**

**Subject Premises Two – 352 Glenbrook Road, Apartment 30, Stamford, Connecticut**

**Subject Premises Two** is located within a two-story, multi-unit senior living apartment complex. Apartment 30 is accessed by an interior hallway. Apartment 30 has a brown exterior door with the number "30" written on it.





**ATTACHMENT B-2**
**Particular Things to be Seized**

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.

**ATTACHMENT A-3**
**Property to Be Searched**

**Subject Premises Three – 216 West Avenue, Darien, Connecticut**

**Subject Premises Three** is described as a two-story cape style house that is blue in color with white trim and a white colored front door. The number "216" is affixed to the residence in black lettering to the right of the front door. This is a single-family residence with one walkway into the residence and two floors.



**ATTACHMENT B-3**
**Particular Things to be Seized**

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.

**ATTACHMENT A-4**
**Property to Be Searched**

**Subject Premises Four – 511 Shippan Avenue, Apartment 4F, Stamford, Connecticut**

**Subject Premises Four** is a multi-story apartment building. Apartment 4F is located on the fourth floor. Apartment 4F has a brown colored wooden door with "4F" posted to the left of the door. A Google search listed the address as Harboursite affordable rental housing community for seniors run by the National Church Residences (NCR).



# ATTACHMENT B-4
## Particular Things to be Seized

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.

## ATTACHMENT A-5
### Property to Be Searched

**Subject Premises Five – 98 Hoyt Street, Apartment 5E, Stamford, Connecticut**

**Subject Premises Five** is described as a multi-story apartment building. Apartment 5E is located on the fifth floor and "5E" is affixed to a brown colored door to the apartment



**ATTACHMENT B-5**
**Particular Things to be Seized**

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph;

11. Firearms, ammunition, holsters, and weapons and destructive devices; and

12. Safes and other secure storage containers, including traps or secret compartments.

**ATTACHMENT A-6**
**Property to Be Searched**

**Subject Premises Six – 40 Clinton Ave., Apartment 301, Stamford, Connecticut**

**Subject Premises Six** is described as an apartment located a multi-story apartment building. Apartment 301 is located on the third floor of the building. Apartment 301 has a tan colored door with the number "301" appearing to the left of the door.



**ATTACHMENT B-6**
**Particular Things to be Seized**

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.

ATTACHMENT A-7
**Property to Be Searched**

**2612 North Avenue., Unit A1, Bridgeport, Connecticut**

**Subject Premises Six** is described as an apartment located a multi-story apartment building. Apartment 301 is located on the third floor of the building. Apartment 301 has a tan colored door with the number "301" appearing to the left of the door.



**ATTACHMENT B-7**
**Particular Things to be Seized**

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.

**ATTACHMENT A-8**
**Property to Be Searched**

### Subject Vehicle One

Subject Vehicle One is further described as a 2004 red BMW 325XI bearing Connecticut registration number BM33566 and vehicle identification number BAEU33444PM59780 registered to Ecnera BROOKS, 225 Ludlow Street, Stamford, Connecticut, and used by Rodney CANADA.

**ATTACHMENT B-8**
**Particular Things to be Seized**

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.

## <u>ATTACHMENT A-9</u>
### Property to Be Searched

**Subject Vehicle Two**

Subject Vehicle Two is further described as an unregistered 2015 2-door Mercedes Benz S Class bearing VIN WDDXJ8FB5FA006906 and used by Rodney CANADA.

## ATTACHMENT B-9
## Particular Things to be Seized

All evidence relating to violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846 occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to heroin, fentanyl, cocaine and cocaine base;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds; 6.items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

6. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related

businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph; and

11. Safes and other secure storage containers, including traps or secret compartments.